912 A.2d 152 (2006)
389 N.J. Super. 154
CIPRIANI BUILDERS, INC. and Jay Cipriani, Plaintiffs-Appellants,
v.
Thomas MADDEN and New Jersey Remodelers Association, Inc., Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued September 12, 2006.
Decided December 11, 2006.
*155 Mark J. Oberstaedt, Haddonfield, argued the cause for appellants (Archer and Greiner, attorneys; Mr. Oberstaedt and William L. Ryan, on the brief).
Eric S. Robinson, Atlantic City, argued the cause for respondent Thomas Madden (Youngblood, Corcoran, Lafferty & Hyberg, attorneys; L. Patricia Sampoli, of counsel; Mr. Robinson, on the brief).
Stephen A. Rudolph, Sea Girt, argued the cause for respondent New Jersey Remodelers Association, Inc. (Monte & Rudolph, attorneys; Mr. Rudolph, of counsel; David J. Azotea, on the brief).
Before Judges SKILLMAN, HOLSTON, JR. and GRALL.
*156 The opinion of the court was delivered by
SKILLMAN, P.J.A.D.
This appeal arises out of a trade association's expulsion of one of its members. The member filed suit claiming that the expulsion was wrongful and that the trade association's executive director made statements during the period preceding the expulsion that defamed him. The trial court granted summary judgment dismissing these claims. We affirm the dismissal of the member's defamation claims but reverse the dismissal of his wrongful expulsion claim.
Defendant New Jersey Remodelers Association, Inc. (NJRA) is a trade association composed of more than 100 individuals and corporations involved in the remodeling industry in southern New Jersey. The NJRA provides various benefits to members, including networking with other persons involved in the industry, referrals of work, access to educational programs and seminars, discounted insurance, free or discounted legal and accounting services, and supplier discounts. NJRA members also participate in a Consumer/Contractor Arbitration Board, under which customer claims against members are arbitrated.
Defendant Thomas Madden was the executive director of the NJRA. As executive director, Madden was a member of the NJRA's Board of Directors.
Plaintiffs Jay Cipriani and his company, Cipriani Builders, Inc., became members of the NJRA in 1981.[1] Cipriani was appointed to the NJRA Board of Directors in 1996 and became its Second Vice President in 1999. In late 2000 or early 2001, the President appointed a five person Administrative Committee of the Board, which included Cipriani, to study and make recommendations regarding the NJRA's organization and operations. On March 24, 2001, the Administrative Committee issued a report that recommended various changes, including a reduction in Madden's responsibilities.
Madden reacted hostilely to the Administrative Committee's report and blamed Cipriani and two other members of the Committee for its recommendations. Beginning shortly after submission of this report, Madden sent a series of memoranda to the NJRA Board that criticized the Committee's recommendations. These memoranda, which were written during the period between July 8, 2001 and November 14, 2001, personally attacked three members of the Committee including Cipriani. Cipriani claims that some of the statements in these memoranda defamed him.
Cipriani and the other two Administrative Committee members who Madden blamed for the recommendation that he be relieved of certain responsibilities were renominated as candidates for the NJRA Board in the fall of 2001. Three of Madden's memoranda to the Board containing alleged defamatory statements were directed at Cipriani's and the other two Committee members' candidacies for the NJRA Board. Madden also proposed an alternative slate of candidates.
In the NJRA election held in November 2001, Cipriani and the other two Committee members were defeated and Madden's slate of candidates were elected to the contested positions. Following this election, Madden allegedly continued to campaign against Cipriani with the intention of forcing him out of the NJRA.
On July 14, 2002, Madden sent a lengthy memorandum to the entire NJRA membership that praised the NJRA, criticized a *157 competing trade association called the NARI, set forth his achievements as executive director, and urged members to encourage their subcontractors and competitors to join the NJRA. Several paragraphs of this memorandum were apparently directed at Cipriani and the two other Committee members who had been defeated in the November 2001 election. Those paragraphs, which are the primary foundation of Cipriani's defamation claims, are quoted later in this opinion.
In January 2003, the President of the NJRA decided not to send an invoice for renewal of Cipriani's membership in the NJRA. However, the President did not take any formal action to expel Cipriani.
Even though he had not received an invoice for renewal of his membership, Cipriani sent the NJRA an unsolicited check representing his then due membership fees. At the April 1, 2003 board meeting, the NJRA's treasurer moved to accept the check. However, this motion was defeated, and the NJRA returned the check to Cipriani.
After he received notice that the Board had refused to renew his membership, Cipriani retained counsel, who sent a letter to the Board alleging that Cipriani's membership in the NJRA had been wrongfully terminated. The letter asserted that Cipriani satisfied all membership requirements set forth in the NJRA by-laws and that Cipriani was unaware of any justification for termination of his membership. The letter demanded that the NJRA notify Cipriani of "the basis upon which his membership has been terminated." The letter also requested the NJRA to furnish Cipriani with a copy of "the most recent version of the [NJRA] By-Laws and a description of any grievance or appeal procedure that was in place at NJRA on or before April 1, 2003." In addition to objecting to the termination of Cipriani's membership, this letter alleged that Madden had "repeatedly and consistently defamed Mr. Cipriani" both in official NJRA correspondence and verbally. The letter concluded by expressing Cipriani's desire to amicably resolve the dispute under terms that would involve reinstatement of his membership and retraction of Madden's alleged defamatory statements.
The Board did not respond to this letter, and on July 7, 2003, Cipriani and his company filed this action against the NJRA and Madden. The complaint asserted claims for both wrongful expulsion from the NJRA and defamation. Cipriani's defamation claims were based primarily on the memoranda Madden had sent to the NJRA Board and general membership. The complaint sought reinstatement of Cipriani's membership in the NJRA and compensatory and punitive damages. Defendants' answers asserted, among other things, that Cipriani's defamation claims were barred by the statute of limitations.
After completion of discovery, defendants moved for summary judgment. Defendants contended that Cipriani's defamation claims that were based on statements Madden made more than a year before the filing of the complaint were barred by the one-year statute of limitations applicable to defamation claims, and that even accepting all of Cipriani's factual allegations, defendants were entitled to summary judgment on his other claims.
The trial court concluded in a written opinion that "[t]o the extent that [Cipriani's] slander and libel claims against defendants NJRA and Thomas Madden are based on oral statements or writings that were published before June 7, 2002 [one year before the complaint was filed], they are barred by the [one-year] statute of limitations [provided by N.J.S.A. 2A:14-3]." The court also concluded that the statements Madden made after June 7, *158 2002 were not susceptible of a defamatory meaning. The court rejected Cipriani's wrongful expulsion claim on the grounds that the "NJRA's interest in harmony and moving beyond its contested election outweighs plaintiffs' interest in continued membership" and that "[e]ven if the Board violated [the] NJRA by-laws in declining to renew plaintiffs' membership, judicial action is not warranted because there is no overriding public interest in the affairs of NJRA." Accordingly, the court granted summary judgment dismissing Cipriani's complaint.
Cipriani appeals from the dismissal of both his wrongful expulsion and defamation claims.

I
Private associations do not have unfettered discretion with respect to their membership decisions. See Rutledge v. Gulian, 93 N.J. 113, 118-24, 459 A.2d 680 (1983); Higgins v. Am. Soc'y of Clinical Pathologists, 51 N.J. 191, 198-204, 238 A.2d 665 (1968); Falcone v. Middlesex County Med. Soc'y, 34 N.J. 582, 588-98, 170 A.2d 791 (1961). When judicial intervention is sought regarding a private association's membership decision, the court must determine whether "plaintiff [has] an interest sufficient to warrant judicial action," and if such an interest is shown, whether "that interest [has] been subjected to an unjustifiable interference by the defendant[.]" Rutledge, supra, 93 N.J. at 118, 459 A.2d 680.
In determining whether a plaintiff has an interest sufficient to warrant judicial intervention, our courts distinguish between an application for membership in a private association and the expulsion of a present member: "While the general rule is that courts will not compel admission of an individual into a voluntary association, they have been willing to intervene and compel the reinstatement of a member who has been wrongfully expelled[.]" Higgins, supra, 51 N.J. at 199, 238 A.2d 665; see also Baugh v. Thomas, 56 N.J. 203, 207-09, 265 A.2d 675 (1970).
Our courts also distinguish between membership decisions of private associations whose activities are primarily social or fraternal, such as the Masons and Elks, and membership decisions of associations whose activities directly affect the economic interests of their members, such as professional societies and trade associations. See Falcone, supra, 34 N.J. at 588-89, 170 A.2d 791. If a professional society or trade association exercises "virtually monopolistic control" over a form of economic activity, a court will be especially vigilant in protecting the interests of members and prospective members. Id. at 596, 170 A.2d 791. When a membership decision of such an association is challenged, "[t]he intimate personal relationships which pervade[] the social, religious and fraternal organizations [are] hardly in evidence and [an] individual's opportunity of earning a livelihood and serving society in his chosen trade or profession appear[s] as the controlling policy consideration." Ibid. Consequently, the interest in membership in such an association is sufficient to warrant judicial review of not only an expulsion of a present member but also a denial of admission to membership. See id. at 596-98, 170 A.2d 791; see also Greisman v. Newcomb Hosp., 40 N.J. 389, 395-404, 192 A.2d 817 (1963).
Even if a private association does not exercise monopolistic control over a profession or trade, a court will extend greater protection to membership in a professional or trade association than to membership in a fraternal or social organization. See Higgins, supra, 51 N.J. at 198-202, 238 A.2d 665. If membership in a *159 trade or professional association provides tangible economic benefits, those benefits may create a property interest or contract right in continued membership that protects a member from arbitrary expulsion. See id at 199-200, 238 A.2d 665. Even if a member receives no tangible economic benefits from membership, the loss of reputation or status resulting from expulsion may be sufficient to warrant judicial review. Id. at 200-02, 238 A.2d 665.
If a plaintiff establishes a sufficient interest in membership in a private association to be entitled to judicial review, a court must determine whether the procedures the association followed in making the membership decision were fundamentally unfair. Rutledge, supra, 93 N.J. at 120, 459 A.2d 680. In making this determination, a court will consider whether the association complied with its own internal rules. Ibid.; Baugh, supra, 56 N.J. at 208-10, 265 A.2d 675. If a private association failed to follow its rules in making a membership decision, a court will "balance the organization's interest in autonomy and its reason for straying from its rules against the magnitude of interference with the member's interest in the organization and the likelihood that the established procedures would safeguard that interest." Rutledge, supra, 93 N.J. at 123, 459 A.2d 680.
A court also will review the substance of a private association's membership decision, but this review is "limited." Higgins, supra, 51 N.J. at 202, 238 A.2d 665. Generally, courts will provide relief from an expulsion from membership in a private association on substantive grounds only if the association's rules or its actions with respect to an individual member "conflict with public policy." Ibid.; see also Matthews v. Bay Head Improvement Ass'n, 95 N.J. 306, 327, 471 A.2d 355, cert. denied, 469 U.S. 821, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984); Stowell v. N.J. State Ass'n of Chiefs of Police, 325 N.J.Super. 512, 516-21, 739 A.2d 1011 (App.Div.1999); Zelenka v. Benevolent & Protective Order of Elks, 129 N.J.Super. 379, 382-87, 324 A.2d 35 (App.Div.), certif. denied, 66 N.J. 317, 331 A.2d 17 (1974).
In dismissing Cipriani's wrongful expulsion claim, the trial court stated:
In the case at bar, the termination of plaintiffs' membership does not violate public policy. Although membership in NJRA is advantageous to Mr. Cipriani, it is not necessary for his business pursuits. [Cipriani] continues to be a strong company with increasing gross revenue. Mr. Cipriani points to the loss of friends and business relationships as well as the inability to take advantage of the NJRA discount and education programs; however, Mr. Cipriani testified that he is a member of several trade associations, some of which are national in scope, which offer everything but the discount. On balance, NJRA's interest in harmony and moving beyond its contested election outweighs plaintiffs' interest in continued membership. Even if the Board violated NJRA by-laws in declining to renew plaintiffs' membership, judicial action is not warranted because there is no overriding public interest in the affairs of NJRA.
This rationale is inconsistent with Rutledge, which holds that if an association member has a sufficient interest in membership to warrant judicial protection, the member may be entitled to relief not only if a membership decision violates public policy but also if the procedures the association followed in making that decision were fundamentally unfair. 93 N.J. at 120, 459 A.2d 680. Because Cipriani made a sufficient showing that the procedures the NJRA followed in expelling him were fundamentally unfair, the trial court should *160 have denied the NJRA's motion for summary judgment.
Initially, it is clear that Cipriani had a sufficient interest in his continued membership in the NJRA to warrant judicial protection. Cipriani had been a member of the NJRA since 1981. This membership provided him with the benefit of networking with other persons involved in the remodeling industry, referrals of work from the NJRA, access to educational programs and seminars, discounted insurance, free or discounted legal and accounting services, supplier discounts, and participation in the NJRA program for arbitration of customer complaints. Consequently, even though a person may engage in the remodeling business without being an NJRA member, it is clear that membership in the NJRA provides tangible economic benefits. Such benefits establish the kind of interest in continued membership that warrants judicial protection against an arbitrary and unfair expulsion. See Higgins, supra, 51 N.J. at 201-02, 238 A.2d 665.
Cipriani claims that the procedures the NJRA followed in expelling him were unfair in three respects: (1) the NJRA expelled him without a majority vote of the entire Board, as required by the NJRA by-laws; (2) the Board expelled him without finding any of the grounds for expulsion set forth in the by-laws; and (3) the Board failed to afford him the right provided under the by-laws to appeal his expulsion. We are satisfied that these violations of the NJRA by-laws, which the NJRA does not dispute, could support a finding that the procedures the NJRA followed in expelling Cipriani were fundamentally unfair, and therefore, that the expulsion was wrongful.
The NJRA did not initiate proceedings to terminate Cipriani's membership by formal action of the Board. Instead, the NJRA's President simply instructed the treasurer not to send Cipriani an invoice for renewal of his membership for 2003. The matter was not presented to the Board until several months later, after Cipriani sent an unsolicited check for renewal of his membership. At this point, the Board voted on a motion to accept Cipriani's check. Only eleven members of the Board, which had between fifteen and eighteen members at the time,[2] were present when this vote was taken. Two Board members voted to accept Cipriani's check, six voted to return the check, and three abstained.
Cipriani argues that this was not a valid vote, because the NJRA by-laws require a majority of all members of the Board, not simply a majority of a quorum, to vote for expulsion of a member. Plaintiff alleges that a vote to expel a member is governed by Article XIII, section 11 of the by-laws, which provides that "[a]ll actions that the Board initiates shall be determined by a simple majority vote, except as otherwise specified in this Constitution and By-Laws." Plaintiff contends that the term "simple majority vote" means a majority of the entire board and that there is no provision in the by-laws for a different form of vote for expulsion of a member. The NJRA does not dispute this interpretation of its by-laws.
*161 The NJRA by-laws provide only one method by which a member may be expelled, termination of membership. Article V, section 6 of the by-laws set forth eight grounds for termination of membership, including:
(c) Violation of the Code of Ethical Standards, as hereinafter set forth.
(d) Airing grievances, personal or otherwise, at a general meeting or social function of the Association, without first receiving approval from the Board of Directors.
(e) Conduct unbecoming a member of the Association, as voted upon by a 3/4 majority of the Board of Directors. The Board shall have the option to suspend membership for a period of time as it sees fit.
Despite the absence of authorization for any other method of expulsion of a member, the Board did not terminate Cipriani's membership for any of the eight grounds set forth in the by-laws but instead simply declined to renew his membership. Moreover, the Board did not find that Cipriani had done anything that would justify the termination of his membership under Article V, section 6.
The NJRA by-laws also afford a member the right to appeal a termination of membership. Article V, section 8 provides in pertinent part:
In the event that the Board of Directors votes for suspension or termination, the member shall have the right to appeal such action to the Board by requesting, in writing, a hearing at the next duly constituted meeting of the Board of Directors.
The Board did not advise Cipriani, either when the Treasurer failed to send him a renewal notice or when the Board voted not to accept his check, that he could appeal this action. Moreover, the Board failed to respond to the request in the April 16, 2003 letter from Cipriani's counsel that the Board furnish him with "a description of any grievance or appeal procedure" available to challenge the nonrenewal of his membership.
In sum, the NJRA does not dispute that it violated its own by-laws in expelling Cipriani from membership because the vote to sustain the expulsion did not constitute a majority of the entire Board, the nonrenewal of the membership was not based on any of the grounds for termination set forth in the by-laws, and Cipriani was not afforded a right to appeal the Board's actions. These multiple violations of the NJRA's own by-laws could support a finding that the procedures followed in expelling Cipriani were fundamentally unfair. The essence of a fair procedure for expulsion of a member of a private association, particularly one that affects the member's economic interests, is notice of the basis for the proposed expulsion and a fair opportunity for the member to respond to the charges. See Pinsker v. Pac. Coast Soc'y of Orthodontists, 12 Cal.3d 541, 116 Cal.Rptr. 245, 526 P.2d 253, 256 (1974) ("Although the fair procedure required in this setting clearly need not include the formal embellishments of a trial, an affected individual must at least be provided with some meaningful opportunity to respond to the `charges' against him."). The NJRA effectively expelled Cipriani by failing to renew his membership without giving him any notice of the basis for this proposed action or an opportunity to respond. The NJRA's denial of these basic procedural rights could support a finding that Cipriani's expulsion was wrongful. Moreover, this action was apparently taken without even the required majority vote of the entire Board, which could provide an independent basis for finding that Cipriani's expulsion was wrongful. See Baugh, supra, 56 N.J. at *162 209, 265 A.2d 675; see also Normali v. Cleveland Ass'n of Life Underwriters, 39 Ohio App.2d 25, 315 N.E.2d 482, 485 (1974). Therefore, we conclude that the trial court erred in dismissing Cipriani's wrongful expulsion claim.[3]

II
Cipriani's defamation claims were based partly on four memoranda Madden sent to the NJRA Board and two memoranda he sent to all NJRA members. Five of these memoranda were sent more than a year before Cipriani's complaint was filed. The complaint also alleged that "[o]n numerous occasions, beginning in 2001 and continuing up until the present, Madden made numerous slanderous statements about plaintiffs to NJRA members and other persons in the community[.]" Defendants' answers raised the statute of limitations as an affirmative defense to Cipriani's defamation claims. After completion of discovery and shortly before a scheduled trial date, defendants moved for summary judgment. The part of defendants' motions directed at Cipriani's defamation claims contended that the claims based on statements Madden made before July 7, 2002, which was one year before the filing of Cipriani's complaint, were barred by the applicable one-year statute of limitations contained in N.J.S.A. 2A:14-3 and that the statements Madden made after that date were not susceptible of a defamatory meaning.
The trial court concluded in a written opinion that Cipriani's defamation claims based on statements Madden made before July 7, 2002, were barred by the statute of limitations. The court rejected Cipriani's argument that defendants waived their statute of limitations defense by failing to move for summary judgment on that basis until after the end of discovery. The court also concluded that the statements Madden made after July 7, 2002, were not susceptible of a defamatory meaning. Accordingly, the court granted summary judgment dismissing all of Cipriani's defamation claims.
On appeal, Cipriani argues that (1) defendants waived their statute of limitations defense by failing to move for summary judgment on this basis until shortly before trial; (2) the trial court misapplied the single publication rule to their slander claims based on Madden's post-July 7, 2002 statements; and (3) the court erred in concluding that Madden's post-July 7, 2002 statements were not susceptible of a defamatory meaning.
We conclude that defendants did not waive their statute of limitations defense and that plaintiffs' defamation claims based on Madden's pre-July 7, 2002 statements are barred by the one-year statute of limitations applicable to defamation claims. We also conclude that even though the single publication rule has no applicability to this kind of case, none of Madden's post-July 7, 2002 statements were susceptible of a defamatory meaning. Therefore, we affirm the summary judgment dismissing Cipriani's defamation claims.

A
N.J.S.A. 2A:14-3 provides:
Every action at law for libel or slander shall be commenced within 1 year next after the publication of the alleged libel or slander.
*163 Five of Madden's six memoranda upon which Cipriani bases his libel claims were published more than one year before the complaint was filed. A significant number of Madden's oral statements upon which Cipriani bases his slander claims were also made more than a year before the complaint was filed. Cipriani does not dispute that his defamation claims based on Madden's pre-July 7, 2002 written and oral statements were subject to dismissal under the one-year statute of limitations. Cipriani's sole argument for avoidance of the bar of the statute of limitations is that defendants waived the defense by failing to move for summary judgment on this basis at an earlier stage in the litigation.
In support of this argument, Cipriani relies primarily on Williams v. Bell Telephone Laboratories, Inc., 132 N.J. 109, 118-20, 623 A.2d 234 (1993), in which the defendant failed to present its statute of limitations defense to the plaintiff's defamation claims either by pretrial motion or motion to dismiss at trial and instead sought dismissal on this basis for the first time by post-verdict motion. In concluding that the defendant had waived its statute of limitations defense by not presenting it sooner, the Court stated:
No unforeseen or insurmountable developments intruded in this litigation to inhibit in any way Bell's pursuit of its limitations defense. The mere one-time mention of the statute in Bell's Answerfiled in 1986should not serve to preserve that otherwise-unasserted defense through the entire three-and-one-half-year span of the litigation, through preparation for and conduct of a protracted trial, and into a post-verdict submission, in the course of which both parties undoubtedly expended large amounts of time, money, and energy.
[Id. at 119-20, 623 A.2d 234.]
In contrast, defendants filed their motions for summary judgment seeking, among other things, dismissal of Cipriani's claims based on Madden's pre-July 7, 2002 alleged defamatory statements on statute of limitations grounds shortly after the completion of discovery, which was the first time a dispositive motion regarding this defense could have been made. Although the availability of a limitations defense to Cipriani's libel claims based on five of the six memoranda attached to the complaint may have been obvious from the face of the complaint, Cipriani also alleged that Madden made "slanderous statements" about him "[o]n numerous occasions, beginning in 2001 and continuing up until the present[.]" Defendants had to conduct full discovery to determine both the contents of those alleged statements and when they were made before they could seek dismissal based on the one-year limitations period. Furthermore, the discovery required to determine the availability of a limitations defense to Cipriani's slander claims were the depositions of persons who heard the alleged defamatory statements, which was substantially the same discovery required in connection with the merits of those claims. Therefore, this was not the kind of case in which it would have made sense to undertake limited discovery relevant to the limitations defense, while deferring discovery on the merits.
Moreover, this is not a case such as White v. Karlsson, 354 N.J.Super. 284, 806 A.2d 843 (App.Div.), certif. denied, 175 N.J. 170, 814 A.2d 635 (2002), in which plaintiff's entire complaint was susceptible to dismissal on statute of limitations grounds, or Williams, in which all the plaintiff's defamation claims would have been barred by the statute. It was clear on the face of Cipriani's complaint that one of the memoranda on which his libel claims were based was written within one year of filing of the complaint and that an unspecified *164 number of Madden's alleged slanderous statements also were made within that period. Thus, a motion to dismiss on statute of limitations grounds could not possibly have resulted in a dismissal of all of Cipriani's defamation claims. Under these circumstances, the earlier filing of such a motion could not have prevented the expenditure by the parties of "large amounts of time, money and energy." Williams, supra, 132 N.J. at 120, 623 A.2d 234. Therefore, the trial court correctly concluded that defendants did not waive their statute of limitations defense and that Cipriani's defamation claims based on Madden's pre-July 7, 2002 statements are time-barred.

B
Before discussing the single publication rule, we note that it is unclear what role this rule played in the trial court's dismissal of Cipriani's slander claims based on Madden's post-July 7, 2002 oral statements. Early in its opinion, the court stated that "[i]t is not significant that Mr. Madden repeated or republished the allegedly defamatory statements after the [pre-July 7, 2002] date of original publication[,]" thus implying that Cipriani's slander claims based on Madden's post-July 7, 2002 oral statements that repeated what he stated in pre-July 7, 2002 memoranda were barred by the statute of limitations under the single publication rule. However, later in its opinion, the court concluded that none of Madden's oral statements made after July 7, 2002 were defamatory, without distinguishing between oral statements that repeated alleged defamatory statements contained in the pre-July 7, 2002 memoranda and oral statements that made new defamatory comments. Thus, it is unclear whether the trial court dismissed any of Cipriani's slander claims based solely on the single publication rule or whether the court conceived of this rule as simply an alternative ground for dismissal of slander claims the court also rejected on the merits.
Whatever role the single publication rule may have played in the court's decision, we conclude that the rule does not apply in this kind of case. Generally, any repetition of a defamatory statement gives rise to a new cause of action. Restatement (Second) of Torts § 577A(1) (1977). The single publication rule is a limited exception to this general rule. Under this rule, a plaintiff asserting a defamation claim based on a mass publication, such as a book or newspaper, "has a single cause of action, which arises at the first publication of an alleged libel, regardless of the number of copies of the publication distributed or sold." Churchill v. State, 378 N.J.Super. 471, 478, 876 A.2d 311 (App.Div.2005); see also Restatement (Second) of Torts, supra, § 577A(3). This rule "prevents the constant tolling of the statute of limitations, effectuating express legislative policy in favor of a short statute of limitations period for defamation" and "allows ease of management whereby all the damages suffered by a plaintiff are consolidated in a single case[.]" Churchill, supra, 378 N.J.Super. at 479, 876 A.2d 311.
However, the single publication rule does not apply to the repetition of defamatory statements in any form other than multiple distributions of the same material by the mass media or a single communication heard at the same time by two or more persons. See Restatement (Second) of Torts, supra, § 577A(1)-(3). Any oral repetition by Madden of the alleged defamatory statements contained in memoranda he sent before July 7, 2002 obviously would not constitute part of such a single publication. Therefore, the single publication rule does not apply to this case, and Cipriani's slander claims based on *165 Madden's alleged defamatory oral statements made after July 7, 2002 are not barred by the statute of limitations.

C
The "threshold issue" in any defamation action is "whether the language used is reasonably susceptible of a defamatory meaning." Kotlikoff v. The Cmty. News, 89 N.J. 62, 67, 444 A.2d 1086 (1982). "Whether the meaning of a statement is susceptible of a defamatory meaning is a question of law for the court." Ward v. Zelikovsky, 136 N.J. 516, 529, 643 A.2d 972 (1994). In making this determination, a court "must consider the content, verifiability, and context of the challenged statements." Ibid.
Plaintiffs' defamation claims that are not barred by the statute of limitations focus upon the statements contained in Madden's July 14, 2002 memorandum to the members of the NJRA. In fact, the argument section of plaintiffs' original brief only discusses the July 14, 2002 memorandum; it does not contend that Madden made any defamatory oral statements.
The July 14, 2002 memorandum is a twenty-eight paragraph document that praises the NJRA's role as a trade association and Madden's own performance as executive director, refers to criticism the NJRA received as a result of the conduct of an illegal raffle, summarizes pending legislation affecting the NJRA, criticizes another competing trade association called the NARI, and encourages members to undertake efforts to increase the NJRA's membership. Five paragraphs refer to Cipriani's actions as an officer and Board member and the contested election in which Madden's slate of candidates defeated Cipriani and the two other members of the Administrative Committee who recommended a reduction in Madden's responsibilities. Those paragraphs state:
But we have maintained all of this for decades on a shoestring and, in recent times, despite lowly maneuvers, illegal rule-breaking and obvious takeover attempts by others with political loyalty to another trade group. Mainly because of such ugly politics and power trips that group is now dead or exists in name only. Now, this less than a handful has switched allegiance to yet another trade group. Let us work together and insure that we will never allow such things to ever happen again.
Back in the 1980's when we were affiliated with the old National Remodelers Association, we wanted out and then we wanted no part of the group that came out of a national mergerNARI. There were too many scandals and few membership services. The membership spoke with their votes to not join NARI. And what happened? A couple of members whose ego and power trips couldn't accept your vote created a local NARI in violation of a legal vote.
. . . .
After almost a year of unbelievable maneuvering, less than a handful forced us into that first-ever election with two slates, one with seven unified candidates and one with three. Again, the membership spoke against depressing negativity and power seeking. Other groups may tolerate such negativity, but it's not the NJRA way. The victory was far beyond overwhelming.
So now what has happened after the membership overwhelmingly spoke . . . as it did in the '80s? Again, this less than a handful, with a few loyal to the old NARI, approached the new home organization to create a "Remodelers Council." The hell with the fact that our most renowned trade group in the history of our industry just happens to *166 be located here in South Jersey. The hell with your vote or any consideration of a unified industry. Of the very few non-new home members in attendance at their "kick-off" meeting, guess who showed? That's right. NARI past presidents and some ex-NARI members.
. . . .
We have become stronger out of a situation that probably would have destroyed any other group. Our members are so great and real. They actually applauded what small minds considered would be bad news and have reacted strongly. Unite behind that strength. Now put action behind your words of support. The ethical, professional and humanitarian brother/sisterhood of the NJRA will never be deterred. We faced negativity and dissension-causing tactics from the outside in the past. Such tactics from the inside again have failed. We are made of very strong stuff and will never be beaten back. So now, participate even more and add to the historic and enduring legacy of the New Jersey Remodelers Association.
In support of his defamation claims, Cipriani focuses particularly on the phrases "lowly maneuvers," "illegal rule-breaking" and "dissension-causing tactics" in the quoted part of the July 14, 2002 memorandum. We conclude that, considered in the overall context of Madden's memorandum to the members of the NJRA, these phrases were not susceptible of a defamatory meaning.
"Although perhaps directly injurious to a person, name-calling does not have a defamatory content such that harm to reputation can be shown." Ward, supra, 136 N.J. at 529, 643 A.2d 972. "Likewise, courts differentiate between defamatory statements and statements of rhetorical hyperbole." Id. at 530, 643 A.2d 972. In determining whether an alleged defamatory statement was actually only rhetorical hyperbole, a court must consider whether the statement is verifiable. Id. at 530-32, 643 A.2d 972. "Factual statements, unlike non-factual statements, are uniquely capable of objective proof of truth or falsity." Id. at 530, 643 A.2d 972. "`Loose, figurative or hyperbolic language' will be less likely to imply specific facts, and thus more likely to be deemed nonactionable as rhetorical hyperbole[.]" Id. at 532, 643 A.2d 972 (quoting Milkovich v. Lorain Journal Co., 497 U.S. 1, 21, 110 S.Ct. 2695, 2707, 111 L.Ed.2d 1, 19 (1990)).
Even assuming the NJRA members who received Madden's July 14, 2002 memorandum would have understood the quoted portions of the memorandum to refer to Cipriani and the other two Administrative Committee members who recommended a reduction in Madden's responsibilities despite the fact that they are not mentioned by name, the accusation that they engaged in "lowly maneuvers" and "dissension-causing tactics" was merely "rhetorical hyperbole" because these statements have no specific factual content and therefore would not be "capable of objective proof of truth or falsity." Id. at 530, 643 A.2d 972.
Although a statement that a person engaged in "illegal rule-breaking" could be susceptible of a defamatory meaning in some contexts, Madden's use of this phrase in the July 14, 2002 memorandum could not be found to be defamatory. We reject Cipriani's argument that this statement could be understood to mean "plaintiffs had broken some unspecified law." The only recipients of the memorandum who were deposed, the President of the NJRA, John Marnie, and the past President, William Poulson, testified that they understood the term "illegal rule-breaking" to refer to the NJRA by-laws, not to statutory law. In fact, Marnie testified *167 that he understood Madden's use of the term "illegal" to mean that Cipriani and the other members of the Administrative Committee "were just not doing things according to the way the NJRA always does them." Madden did not allege that either Cipriani or the other Committee members at whom his comments were apparently directed had violated any specific NJRA by-law. For this reason, Madden's allegation that those members had engaged in "illegal rule-breaking" was not capable of verification. Therefore, we conclude that this isolated phrase, considered in the overall context of Madden's twenty-eight paragraph memorandum, was merely rhetorical hyperbole.
As previously noted, Cipriani's original brief did not argue that Madden made any defamatory oral statements after July 7, 2002. Consequently, the NJRA's answering brief only discussed whether Madden's July 14, 2002 memorandum contained statements that were susceptible of a defamatory meaning. However, Cipriani argued in his reply brief that Madden made slanderous statements about him continuing through the end of 2003. We question whether this argument is properly before us. See Twp. of Warren v. Suffness, 225 N.J.Super. 399, 412, 542 A.2d 931 (App. Div.1988) (noting that "[t]o raise [an] issue initially in a reply brief is improper.").
In any event, Cipriani failed to identify any specific oral statement Madden made after July 7, 2002 that was susceptible of a defamatory meaning. In support of their slander claims, plaintiffs rely upon the part of Marnie's deposition in which he stated that Madden, in the course of urging the board not to renew Cipriani's membership, repeated "[a]ll the specifics . . . outlined in all his letters," referring to alleged defamatory statements contained in Madden's pre-July 7, 2002 memoranda to the Board. However, Marnie's testimony regarding what Madden said about Cipriani was extremely vague. The entirety of the excerpt from Marnie's deposition Cipriani relies upon reads as follows:
Q. Was Mr. Madden advocating not renewing Mr. Cipriani's membership?
A. Yes.
Q. What did he say in that regard?
A. He said that Mr. Cipriani should not be renewed because of the way he has conducted himself as a member, paraphrasing of course.
Q. What specifics do you remember him saying?
A. All the specifics were outlined in all his letters. That's basically the specifics.
Q. Did he reiterate those specifics at this meeting in January 2003?
A. Repeat them again. The same thing, I imagineI can't imagine. I don't recall.
Q. Do you remember him repeating at the January 2003 meeting, for example, his belief that, or at least his statement that Mr. Cipriani had acted illegally?
A. I don't recall.
We agree with the trial court that this vague testimony provided an inadequate evidential foundation for a jury to find that Madden made any specific oral statement after July 7, 2002 that defamed Cipriani.
Because we conclude that neither Madden's July 14, 2002 memorandum to the NJRA members nor any oral statement he made after July 7, 2002 were susceptible of a defamatory meaning, there is no need to consider Madden's argument that Cipriani was a "limited purpose public figure" when the alleged defamatory statements were made.
Accordingly, we reverse the order dismissing Cipriani's wrongful expulsion *168 claim and remand that claim to the trial court. We affirm the dismissal of Cipriani's defamation claims.
NOTES
[1] Cipriani and his company are referred to collectively in this opinion as Cipriani.
[2] The NJRA's officers exhibited some uncertainty concerning the number of Board members. The President, John Marnie, testified that the Board had sixteen to eighteen members while both Cipriani and the former President, William Poulson, testified that it had fifteen members. Whichever of these numbers was correct, it is clear that the six Board members who voted not to accept Cipriani's renewal check did not constitute a majority of the Board's entire membership.
[3] Cipriani did not file a cross-motion for summary judgment on this claim. Consequently, there is no occasion for us to decide whether this claim presents any contested issue of fact that would require a trial.