75 A.3d 1241

NUWAVE INVESTMENT CORPORATION, TROY W. BUCKNER, AND JOHN S. RYAN, PLAINTIFFS–RESPONDENTS, v. HYMAN BECK & COMPANY, INC., ALEXANDER HYMAN AND RICHARD DEFALCO, DEFENDANTS, AND FIRST ADVANTAGE LITIGATION CONSULTING, LLC (F/K/A BACKTRACK REPORTS, INC.), DEFENDANT–APPELLANT.

NUWAVE INVESTMENT CORPORATION, TROY W. BUCKNER, AND JOHN S. RYAN, PLAINTIFFS–APPELLANTS, v. HYMAN BECK & COMPANY, INC., AND ALEXANDER HYMAN, DEFENDANTS–RESPONDENTS, AND FIRST ADVANTAGE LITIGATION CONSULTING, LLC (F/K/A BACKTRACK REPORTS, INC.), AND RICHARD DEFALCO, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued February 26, 2013—Decided September 19, 2013.

Before Judges MESSANO, LIHOTZ and KENNEDY.

*Kenneth A. Schoen* and *Becky L. Caruso* argued the cause for appellant in A–5275–10 (*Bonner, Kiernan, Trebach & Crociata, LLP,* attorneys; *Mr. Schoen, Alexander H. Gillespie* and *Ms. Caruso,* on the brief).

*John F. Olsen* argued the cause for respondents NuWave Investment Corp., Troy W. Buckner, and John S. Ryan in A–5275–10 and appellants in A–5451–10 (*Law Office of John F. Olsen,* attorney; *Mr. Olsen,* on the brief).

*Ian S. Marx* argued the cause for respondent Hyman Beck & Company, Inc. in A–5451–10 (*Greenberg Traurig, LLP,* attorneys; *Philip R. Sellinger,* on the brief).

The opinion of the Court was delivered by

MESSANO, P.J.A.D.

These two appeals were calendared back-to-back and argued together. We have consolidated the appeals for the purpose of filing a single opinion.

Plaintiffs Troy Buckner and John Ryan were principals of NuWave Investment Corporation (NuWave, and collectively, plaintiffs), which Buckner founded after he left employment with defendant Hyman Beck & Company (Hyman Beck), the employer of defendants Alexander Hyman and Richard A. DeFalco (collectively, the Hyman Beck defendants). Defendant First Advantage Litigation Consulting, LLC, formerly known as BackTrack Reports, Inc. (BackTrack), prepared background investigative reports regarding the financial industry for clients considering investment opportunities.[1] BackTrack prepared such reports on Buckner, Ryan and NuWave. Those reports included statements, many of which were attributed to the Hyman Beck defendants, that plaintiffs considered defamatory.

---

[1] To avoid confusion, we generally will refer to defendant as BackTrack throughout the opinion.

On February 8, 2006, plaintiffs filed a complaint asserting: trade libel and defamation against all defendants; intentional interference with economic advantage as to the Hyman Beck defendants; and negligence as to BackTrack. Plaintiffs subsequently filed an amended complaint asserting malicious abuse of process against BackTrack.

Plaintiffs' defamation claim against the Hyman Beck defendants was dismissed based upon the applicable one-year statute of limitations. *See N.J.S.A.* 2A:14–3 ("Every action at law for libel or slander shall be commenced within 1 year next after the publication of the alleged libel or slander."). Subsequent dismissals left only the defamation claim against BackTrack for trial.

The jury found BackTrack liable and awarded the following amounts as "presumed damages": NuWave—$1 million; Buckner—$150,000; Ryan—$50,000. The jury further determined that NuWave suffered $1.406 million in "actual damages" as a proximate result of BackTrack's defamatory statements, but neither Buckner nor Ryan suffered actual damages. The jury also determined that BackTrack proved Hyman "and/or" DeFalco had defamed plaintiffs and their defamation was "injurious to the plaintiffs," apportioning responsibility as follows: BackTrack—37%; Hyman—53%; DeFalco—10%.[2] Lastly, the jury determined that BackTrack "engaged in malicious or willful and wanton conduct entitling" plaintiffs to punitive damages in the amount of $250,000. The judge molded the verdict and entered an order for judgment on May 20, 2011, that also included pre-judgment interest.

BackTrack now appeals. It argues that the judge erred by permitting the jury to award "presumed damages." In this regard, BackTrack's argument is multi-faceted. It contends that: the reports were not defamatory, or, certainly not libelous per se; and, "the presumed damages doctrine" is inapplicable in the

---

[2] Plaintiffs have not argued that the inclusion of Hyman and DeFalco on the verdict sheet for apportionment purposes was improper. We address the issue no further.

absence of proof of "actual malice" or "where evidence of actual damages is offered." BackTrack also argues the judge erred: in concluding no "qualified privilege" applied to the reports; by finding BackTrack owed a duty to plaintiffs; by denying Back-Track summary judgment on the ground that the complaint was barred by the statute of limitations; and by denying BackTrack's motion for a directed verdict. Lastly, BackTrack attacks the award of punitive damages because the judge denied a request for curative instructions based upon comments made by plaintiffs' counsel in his summation.

Plaintiffs also appeal. They contend the judge erred in dismissing their claim against the Hyman Beck defendants as barred by the statute of limitations, arguing the "discovery rule" applies.

We have considered these arguments in light of the record and applicable legal standards. On BackTrack's appeal, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion. As to plaintiffs' appeal, we affirm.

## I.

Prior to trial, both sides moved for summary judgment. By order dated January 28, 2011, the judge granted plaintiffs partial summary judgment as to two issues. Because the grant of partial summary judgment to plaintiffs on one of those issues affected the course of the trial and requires our reversal, we address that first.

## A.

The judge determined that certain statements contained in the BackTrack reports were per se defamatory. The nature of these statements can be understood most easily by reference to the jury verdict sheet used during trial, which, with minor editing changes by the judge for clarity, accurately set forth the contents of the BackTrack reports:

1. "[W]e basically fired [Buckner] ... He was terminated here. His employment was terminated at the end of his contract."

2. "Mr. Buckner got fired."

3. "[Buckner] was down 50% for us, in five years."

4. "[Buckner] stole things from [Hyman Beck] when he left."

5. "[W]hen [Buckner] was removed from Hyman Beck—he did a lot of crazy things, like" take the server; take a lot of trading systems that didn't belong to him."

6. "[Ryan] was stealing things and sending them over to [Buckner] ... [Ryan was stealing] [i]nternal file, emails, [and] customer lists."

7. "[Ryan] was the one that stole the system from [Hyman Beck].... They stole the server from [Hyman Beck].

8. "[T]he tables of [NuWave's] performance data are fudged."

9. "[Buckner] doubled over an account without telling the customer. He doubled the positions on the account. They agreed to a risk amount, or an account size. The customer called and complained and he said, 'Look, I have power of attorney....'"

10. "[Buckner] double leveraged the account without asking the client. And when he did that the client called him and said they didn't want to trade that amount of leverage. [Buckner] responded saying, 'I have power of attorney on this account. I can do what I deem necessary ...'"

11. "Ryan and Buckner basically lost a big account. I don't know who it was, but there was an account there that gave them $15 million."

12. "[When Ryan] left [Hyman Beck], he erased his entire hard drive. We had to hire people to come in here to figure out what he did."

13. "[Ryan] actually took [Hyman Beck] down for a day, by changing our default gateway, remotely. And when we traced [the] address back, it came back to NuWave Corp."

14. "They tried to take our Internet service down."

15. "The last couple of years were awful performance. [Buckner] should be showing that record [from Hyman Beck].... [B]y law you are required to show your results."

16. "[Buckner's] not allowing his track record that he had at Hym[a]n Beck to follow him.... [H]e's not taking it with him from his new shop. You know that from his Web site.... [I]t needs to be on his Web site, because that's his track record."

17. "[Buckner's] blown up three times in the business ... [Buckner] blew up when he was at ... Classic Capital."

18. "Prior to [Classic Capital] [Buckner] traded his own account and he almost lost entire net worth."

19. "[T]he last six months [at Hyman Beck] [Buckner] wasn't really coming into the office."

20. "[Buckner] signed a contract ... where it says that he can't take any employees from Hyman Beck ... for a period of two years [after his departure]. And he took John McCormick.... A year later, he takes John Ryan."

21. "[T]hey have repeatedly gone against the covenants of their contract. . . ."

22. "BackTrack verified with the University of Delaware that . . . Buckner graduated from the school with a major in accounting in 1984."

Almost exclusively these statements resulted from interviews of Hyman and DeFalco that BackTrack conducted in 2002, and which were incorporated in a report BackTrack issued to Moore Capital & Management Inc. (Moore Capital) in October 2002. Buckner left Hyman Beck in 2000 and formed NuWave. Ryan left Hyman Beck in 2001 and joined NuWave soon thereafter.

The statements contained in the Moore Capital report were essentially repeated in three other reports that BackTrack furnished to clients commissioning background investigations of Buckner, Ryan and NuWave. These other reports were issued to FINALTIS in April 2004; New Finance Capital Partners in September 2005; and, Mayer & Hoffman Capital Advisers LLC in January 2006.

On plaintiffs' motion for partial summary judgment, the judge concluded the statements were per se defamatory. In his comprehensive written opinion, the judge explained the statements were not opinions, for which no action in defamation could lie, because they contained verifiable facts, which, if proven false, could sustain a cause of action. The judge also determined that the statements were per se defamatory "because they allege occupational incompetence and even criminal conduct," two of the categories recognized as inherently defamatory. In his final jury instructions, the judge told the jury:

I have determined[ ] as a matter of law, that the categories into which the statements fall are factual in nature and would be understood by a reasonable listener to carry a defamatory meaning. Based on my legal finding you . . . must accept my ruling that the first element of defamation . . . has been established.[3]

Before us, BackTrack argues that the statements were not defamatory because they were opinions or otherwise not actionable, and, even if the statements were factual, they were not per

---

[3] The jury was still required to consider whether the statements were false, and whether BackTrack made the statements negligently or recklessly.

se defamatory. BackTrack further contends that, as a result of this erroneous ruling, the jury was told to consider "presumed damages," which, it argues, should not have been considered at all because there was no proof BackTrack acted with actual malice, and because plaintiffs introduced proof of, and the jury awarded, actual damages.

The elements of a cause of action for defamation are: " '(1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher.' " *Leang v. Jersey City Bd. of Educ.*, 198 *N.J.* 557, 585, 969 *A.*2d 1097 (2009) (quoting *DeAngelis v. Hill*, 180 *N.J.* 1, 13, 847 *A.*2d 1261 (2004)). "A defamatory statement, generally, is one that subjects an individual to contempt or ridicule, one that harms a person's reputation by lowering the community's estimation of him or by deterring others from wanting to associate or deal with him." *G.D. v. Kenny*, 205 *N.J.* 275, 293, 15 *A.*3d 300 (2011) (citations omitted).

"To determine if a statement has a defamatory meaning, a court must consider three factors: '(1) the content, (2) the verifiability, and (3) the context of the challenged statement.' " *Leang, supra,* 198 *N.J.* at 585, 969 *A.*2d 1097 (quoting *DeAngelis, supra,* 180 *N.J.* at 14, 847 *A.*2d 1261). As the Court further explained:

> [T]o evaluate a statement's content, a court must consider the fair and natural meaning that will be given to the statement by reasonable persons of ordinary intelligence. When considering verifiability, a court must determine whether the statement is one of fact or opinion. While a statement of opinion generally enjoys absolute immunity, a statement of fact is actionable [o]nly if the statement suggested specific factual assertions that could be proven true or false. Finally, to decide whether a statement is capable of a defamatory meaning, a court must consider the listener's reasonable interpretation, which will be based in part on the context in which the statement appears. In general, words that subject a person to ridicule or contempt, or that clearly sound to the disreputation of an individual are defamatory on their face.
>
> [*Ibid.* (citations omitted) (second alteration in original).]

"Whether the meaning of a statement is susceptible of a defamatory meaning is a question of law for the court." *Ward v. Zelikovsky,* 136 *N.J.* 516, 529, 643 *A.*2d 972 (1994). "In construing the meaning of . . . the common law, our review is de novo." *Nicholas v. Mynster,* 213 *N.J.* 463, 478, 64 *A.*3d 536 (2013) (citing *Murray v. Plainfield Rescue Squad,* 210 *N.J.* 581, 584, 46 *A.*3d 1262 (2012) (in turn citing *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995))).

Backtrack asserts that the statements were not actionable because they reflect the opinions of Hyman and DeFalco. It further argues that because the reports were being furnished to a limited audience of sophisticated investors, potential readers would not have accepted the statements as factual.

Opinions "are generally not capable of proof of truth or falsity because they reflect a person's state of mind," and as such are usually not actionable as defamation. *Ward, supra,* 136 *N.J.* at 531, 643 *A.*2d 972. For example, stating a person "was dishonest and lacking in integrity" is an opinion that is generally not subject to verification. *Gulrajaney v. Petricha,* 381 *N.J.Super.* 241, 253–54, 885 *A.*2d 496 (App.Div.2005). However, a "defamatory opinion statement" is actionable when it implies "reasonably specific assertions" of "underlying objective facts that are false." *Ward, supra,* 136 *N.J.* at 531, 643 *A.*2d 972.

Here, the statements contained in the reports were, for the most part, not opinions, but rather Hyman's and DeFalco's factual assertions regarding Buckner's and Ryan's conduct while employed at Hyman Beck, and, to some extent, their conduct of NuWave's business after they left. The statements imputed serious ethical, if not criminal, breaches, and were the kind of statements that "subject a person to ridicule or contempt, or that clearly sound to the disreputation of" plaintiffs. *Leang, supra,* 198 *N.J.* at 585, 969 *A.*2d 1097. We find no error in the judge's

decision that the statements were defamatory.[4]

Historically, "slander *per se* ... [was] limited to defamatory statements which impute to another person (1) a criminal offense; (2) a loathsome disease; (3) conduct, characteristics or a condition that is incompatible with his business, trade or office; or (4) serious sexual misconduct." *Biondi v. Nassimos*, 300 *N.J.Super.* 148, 154, 692 *A.*2d 103 (App.Div.1997). "If a defamatory statement constitutes slander *per se*, a plaintiff may establish a cause of action not only without proving 'special damages,' that is, damages of a pecuniary nature, but without proving any form of actual damage to reputation." *Ibid.* (quoting *Ward, supra*, 136 *N.J.* at 540–41, 643 *A.*2d 972). "This is sometimes referred to as the 'presumed damages' doctrine." *Ibid.* (quoting *Sisler v. Gannett Co.*, 104 *N.J.* 256, 281, 516 *A.*2d 1083 (1986)).

Since this appeal was briefed, the Supreme Court decided *W.J.A. v. D.A.*, 210 *N.J.* 229, 43 *A.*3d 1148 (2012), which provides us with necessary guidance to dispose of BackTrack's claims regarding errors flowing from the judge's decision that the statements were per se defamatory.

In *W.J.A.*, the Court explained the historical distinctions between libel and slander and noted, the two "are not the same and it is in connection with damages that they diverge most obviously." *Id.* at 239, 43 *A.*3d 1148. "Damages which may be recovered in an action for defamation are: (1) compensatory or actual, which may be either (a) general or (b) special; (2) punitive or exemplary; and (3) nominal." *Ibid.* (citation omitted). "Actual

---

[4] We agree with BackTrack that some of the statements were not defamatory as a matter of law. For example, the statement regarding the extent of Buckner's undergraduate education, while allegedly false, was not defamatory. Of the twenty-two statements listed on the verdict sheet, the jury determined five were not false, and BackTrack did not act recklessly or negligently regarding the truth of four other statements. Any error as to a specific statement was inconsequential given the jury's conclusion that a total of thirteen statements, most of which were defamatory as a matter of law, were false and recklessly or negligently made by BackTrack.

damages ... refer[ ] to the real losses flowing from the defamatory statement," and are "not limited to out-of-pocket loss, but include[ ] impairment to reputation and standing in the community, along with personal humiliation, mental anguish, and suffering to the extent that they flow from the reputational injury." *Ibid.* (citations omitted).

"Contained within the notion of actual damages is the doctrine of presumed damages—the losses which are normal and usual and are to be anticipated when a person's reputation is impaired." *Ibid.* (citation omitted). Notably, "[p]resumed damages apply in libel cases." *Id.* at 240, 43 *A.*3d 1148. Only "slander per se, *like libel,* permits the jury to consider presumed damages." *Ibid.* (emphasis added).

As to BackTrack, the defamation was libel, not slander. *See id.* at 238, 43 *A.*3d 1148 ("libel is defamation by written or printed words"). Thus, it was inconsequential whether the statements fit into one of the categories of slander *per se.* Generally speaking, having once established that a statement was libelous, a plaintiff is entitled to have the jury instructed as to presumed damages.[5] *Id.* at 240, 43 *A.*3d 1148.

BackTrack asserts that the jury should not have been permitted to return a verdict based upon presumed damages because plaintiffs failed to prove the statements in the reports were made with actual malice. The Court in *W.J.A.* has since made clear that "the malice standard" does not apply to private defamation claims. *Id.* at 246, 43 *A.*3d 1148.

BackTrack next argues that "presumed damages" should not apply when "evidence of actual damages was offered at trial and actual damages were awarded." BackTrack notes that the award

---

[5] We limit this general assertion to a claim brought by a private plaintiff regarding a private matter. Presumed damages are not available in cases of public concern absent proof of actual malice. *W.J.A., supra,* 210 *N.J.* at 244, 43 *A.*3d 1148 (citing *Rocci v. Ecole Secondaire Macdonald–Cartier,* 165 *N.J.* 149, 158–59, 755 *A.*2d 583 (2000)).

of $1.406 million in actual damages reflects the jury's acceptance of specific testimony regarding NuWave's actual lost profits and costs attributable to BackTrack's reports. We agree that in the wake of *W.J.A.*, the doctrine of presumed damages has limited continued vitality in such circumstances.

■ "Where a plaintiff does not proffer evidence of actual damage to reputation, the doctrine of presumed damages permits him to survive a motion for summary judgment and to obtain nominal damages, thus vindicating his good name." *W.J.A., supra*, 210 *N.J.* at 233, 43 *A.*3d 1148. "Presumed damages are a procedural device which permits a plaintiff to obtain a damage award without proving actual harm to his reputation." *Id.* at 239, 43 *A.*3d 1148 (citation omitted).

In *W.J.A.*, the Court surveyed the current jurisprudence of other jurisdictions regarding presumed damages, concluding that "the majority of our sister states have retained the doctrine." *Id.* at 246, 43 *A.*3d 1148. The Court further noted: "[t]he main criticisms of presumed damages are based on two notions: (1) that the emphasis of modern tort law is injury and that where there is no injury, tort law should not provide a remedy; and (2) that there is no uniform way for a jury to value presumed damages." *Id.* at 247, 43 *A.*3d 1148.

Disagreeing with "the first criticism," the Court noted that, when recognizing the existence of a duty, our jurisprudence "identifies deterrence as an important element." *Ibid.* Therefore, "vindication is a significant part of the analysis. A trial, even one with only nominal damages awarded, will establish that a defendant's allegations against a plaintiff were false." *Ibid.* "[P]resumed damage does not mean that no damage occurred. Rather, it operates as a procedural device which relieves a plaintiff from *proving* specific damages." *Ibid.*

However, the Court "acknowledge[d] that the critics' second point—unguided jury evaluation of presumed damages—is fair." *Id.* at 249, 43 *A.*3d 1148.

[1]t seems to us that the doctrine of presumed damages continues to have vitality by permitting a plaintiff to survive summary judgment and *to obtain nominal damages at trial.* That approach sensibly delimits the doctrine of presumed damages *by precluding a compensatory award,* thus obviating the argument regarding unguided jury verdicts. To receive a compensatory award for reputational loss, a plaintiff will be required to prove actual harm, *pecuniary or otherwise,* to his reputation through the production of evidence.

[*Ibid.* (emphasis added).]

While *W.J.A.* makes clear that a defamation plaintiff may proceed to trial in the absence of proof of "actual harm" by utilizing the "procedural mechanism" of presumed damages, the Court did not explicitly address the issue raised by this appeal. Specifically, whether a jury may award both presumed damages and damages based upon proven "actual harm."

We distill from the Court's opinion in *W.J.A.* the following. While an adequately instructed jury may make an award of presumed damages absent proof of actual harm to a plaintiff's reputation, the award must be "nominal." The policy undergirding the continued vitality of the doctrine of "presumed damages," however, is completely served if the jury accepts proof of "actual harm" flowing from the defamation and makes an appropriate award of damages. In other words, a plaintiff's good name is surely "vindicated" in those circumstances.

Therefore, we conclude that a jury cannot do both, i.e., award both presumed nominal damages and other "actual damages." This limitation is consistent with general principles expressed by the *Restatement (Second) of Torts.* It provides that "[n]ominal damages are awarded when the insignificant character of the defamatory matter ... leads the jury to believe that no substantial harm has been done to [the plaintiff's] reputation, *and* there is no proof that serious harm has resulted from the defendant's attack upon the plaintiff's character and reputation." *Restatement (Second) of Torts,* § 620 cmt. a (1977) (emphasis added). *"They are also awarded when they are the only damages claimed,* and the action is brought for the purpose of vindicating the plaintiff's character by a verdict of a jury that establishes the falsity of the defamatory matter." *Ibid.* (emphasis added).

This is to be contrasted with the *Restatement's* position regarding "general damages." *See id.* at § 621 ("One who is liable for a defamatory communication is liable for the proved, actual harm caused to the reputation of the person defamed."). "In defamation actions[,] general damages are imposed for the purpose of compensating the plaintiff for the harm that the publication has caused to his reputation." *Id.* cmt. a. "At common law general damages have traditionally been awarded not only for harm to reputation that is proved to have occurred, *but also, in the absence of this proof,* for harm to reputation that would normally be assumed to flow from a defamatory publication of the nature involved." *Ibid.*

We must conclude that in light of *W.J.A.,* a jury should be instructed that it may award presumed damages of nominal value if a plaintiff fails to prove compensatory or other actual damages. We therefore agree with BackTrack that the award of presumed damages that exceeded $1 million in this case must be vacated. The only remaining issue is whether our conclusion also requires vacation of the entire judgment and a new trial on damages.

In his instructions to the jury, the judge essentially followed *Model Jury Charge (Civil)* 8.46, "Defamation Damages (Private or Public)" (March 2010). Those instructions provide that a jury may award both actual damages for "particular material, economic or financial losses" proximately caused by the defamation, and damages "which the law presumes to follow naturally and necessarily from the" defamation, and "which are recoverable ... without proof of causation and without proof of actual injury." [6] *Ibid.*

---

[6] We note that in light of *W.J.A.* and our holding, the model jury charge should be re-examined. Actual damages suffered by a defamation plaintiff as the proximate result of the libel are recoverable even without specific proof of financial loss. *See Ricciardi v. Weber,* 350 *N.J.Super.* 453, 475, 795 A.2d 914 (App.Div.2002) ("In action for slander ... [t]he plaintiff must prove special damages in the form of pecuniary or economic harm to his reputation. By

The jury verdict sheet in this case posed two questions on damages. The first, under the heading "PRESUMED DAMAGES," asked the jury to determine the reasonable compensation to plaintiffs "for the damage to their reputations ... by reason of the false and reckless or negligent publication[ ]" of statements by BackTrack. The second, under the heading "ACTUAL DAMAGES," asked the jury to determine the reasonable compensation to plaintiffs "for the damage to their reputations ... as a proximate result of the publication" of statements by BackTrack. As noted, the jury awarded presumed damages to NuWave, Buckner and Ryan, and actual damages to NuWave; but, it specifically rejected an award of actual damages to Buckner and Ryan. Because we cannot ascertain with confidence whether, if properly instructed on the law of presumed damages in light of *W.J.A.*, the jury would have reached a different result in its award of "actual damages," we conclude the entire judgment must be vacated. In fairness, plaintiffs should be accorded the opportunity to present their evidence and argue the import of that evidence before the jury on a clean slate. If, at any re-trial, the jury decides the evidence does not support an award of actual damages as to any defendant, the judge should instruct the jury that it may, nonetheless, make an award of nominal presumed damages.

## B.

BackTrack also claims it was error for the judge to grant plaintiffs partial summary judgment as to whether the reports were entitled to a qualified privilege. The judge reasoned that "BackTrack did not have any preexisting relationship with Moore Capital which would accord it protection.... The statements did *not* involve a matter of public concern or interest; rather[,] they related to the economic interests of the speaker[,]" i.e., BackTrack, "and its specific business audience."

contrast, in an action for libel ... the plaintiff may prove any form of actual damage to reputation, either pecuniary or non-pecuniary.").

 While the existence of a privilege in a defamation case is "a question of law for the court's determination," *Lawrence v. Bauer Publishing & Printing*, 89 *N.J.* 451, 462, 446 *A.*2d 469, *cert. denied*, 459 *U.S.* 999, 103 *S.Ct.* 358, 74 *L.Ed.*2d 395 (1982), "questions of motivation" "are a jury function." *Bainhauer v. Manoukian*, 215 *N.J.Super.* 9, 40, 520 *A.*2d 1154 (App.Div.1987). Thus, "the court determines 'whether the occasion upon which the defendant published the defamatory matter gives rise to a privilege,'" whereas "the jury determines 'whether the defendant abused a conditional privilege'" through improper or excessive conduct. *Id.* at 40–41, 520 *A.*2d 1154 (quoting *Restatement (Second) of Torts, supra,* § 619). If a privilege exists, the plaintiff has the burden of showing by clear and convincing evidence that the defendant has abused it. *Feggans v. Billington*, 291 *N.J.Super.* 382, 394–95, 677 *A.*2d 771 (App.Div.1996).

BackTrack essentially contends the statements in its reports were entitled to the qualified privilege recognized in *Lutz v. Royal Ins. Co. of America*, 245 *N.J.Super.* 480, 586 *A.*2d 278 (App.Div. 1991). There, we held that defendants' otherwise defamatory statements were protected by the qualified privilege recognized in *Bainhauer, supra,* 215 *N.J.Super.* at 36, 520 *A.*2d 1154, namely:

> [A] communication "made bona fide upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, although it contains criminatory matter which, without this privilege, would be slanderous and actionable."
>
> [*Ibid.* (quoting *Coleman v. Newark Morning Ledger Co.,* 29 *N.J.* 357, 375, 149 *A.*2d 193 (1959)).]

*See also Erickson v. Marsh & McLennan Co.*, 117 *N.J.* 539, 562, 569 *A.*2d 793 (1990) ("a qualified privilege extends to an employer who responds in good faith to the specific inquiries of a third party regarding the qualifications of an employee").

In *Lutz, supra,* however, we found the "reason" for writing the defamatory memo to be "important, because in order to be considered privileged the communication must be made on a 'subject-matter in which the party communicating has an interest, or in reference to which he has a duty.'" 245 *N.J.Super.* at 497,

586 *A*.2d 278 (quoting *Bainhauer, supra,* 215 *N.J.Super.* at 36, 520 *A*.2d 1154). We concluded that in writing the memo, the employee, Poe, "had both an interest in communicating her experiences with [the] plaintiff and a duty to communicate those experiences[,]" to her superior, who had "a clear interest in [Poe's] communication." *Id.* at 497–98, 586 *A*.2d 278. Each publication of the alleged defamation thereafter was similarly accorded a qualified privilege for the same reasons. *Id.* at 498, 586 *A*.2d 278.

In *Bainhauer, supra,* 215 *N.J.Super.* at 17–18, 520 *A*.2d 1154, in response to an inquiry by his hospital's management, a surgeon issued a report that attributed three adverse patient events to the plaintiff surgeon's conduct. The report was published "within the immediate hospital community," and the plaintiff was fired and unable to find other employment. *Id.* at 13, 520 *A*.2d 1154. We recognized a qualified common interest privilege, observing that each physician "within a hospital community has a significant and obvious interest in the professional qualification, skill and competence of every other health-care professional rendering services within that community." *Id.* at 37–38, 520 *A*.2d 1154. We also noted that "the public relies on the professional judgments of the hospital community to assure it of the professional skill, qualification, and competence of the medical staff it provides." *Ibid.* *Accord Leang, supra,* 198 *N.J.* at 586, 969 *A*.2d 1097 ("speech relating to teachers in their role as educators implicates a matter of public concern, thus calling for the highest level of protection").

In this case, BackTrack was hired by various potential investors and paid for its services. The information it gathered was disseminated to a very targeted group of individual clients. That information had nothing to do with BackTrack, and BackTrack had no interest in the actual subject matter. In short, we reject the claim, as did the trial judge, that BackTrack shared a common interest in the information it provided to its clients, or that it had a duty to disclose such information without regard to its veracity. We conclude the judge properly determined BackTrack's reports were not entitled to a qualified privilege.

## II.

We address BackTrack's other claims regarding liability, all of which we conclude lack sufficient merit to warrant extensive discussion. *R.* 2:11–3(e)(1)(E). We add only the following.

BackTrack contends that the judge erred by concluding that BackTrack owed a duty of care to plaintiffs. BackTrack claims that it only owed a duty to its clients, and that duty was to accurately report the information disclosed during its background investigation regardless of its veracity.

When the issue came up during the pre-trial motions for summary judgment, the judge determined that any investigator owed a duty of reasonable care to the subjects of its report. The judge relied, in part, upon traditional notions of negligence and *Devlin v. Greiner,* 147 *N.J.Super.* 446, 371 *A.*2d 380 (Law Div.1977), which plaintiffs argue before us is specifically on point.

*Devlin* arose in factually similar circumstances—the publication of defamatory material in the report of a private investigator. *Id.* at 452, 371 *A.*2d 380. The judge concluded that the defendant "clearly had a duty to those he observed to report accurately on their activities." *Id.* at 466, 371 *A.*2d 380. However, the reasoning and holding of the case are not particularly relevant to consideration of the issue in the context of a defamation claim, since the above quote dealt solely with the *Devlin* plaintiff's general claim of negligence. *Id.* at 465, 371 *A.*2d 380.[7]

As noted, the basic elements of a defamation claim require that defendant have at least acted negligently. *Leang, supra,* 198 *N.J.* at 585, 969 *A.*2d 1097. "Where, as here, plaintiff is a private figure and the speech is about an exclusively private concern, a traditional negligence standard of fault is applicable, which is defined as communicating the false statement while acting negligently in failing to ascertain the truth or falsity of the statement

---

[7] In this case, the jury only considered whether BackTrack was liable for defamation and not some generalized notion of negligence.

before communicating it." *Feggans, supra,* 291 *N.J.Super.* at 391, 677 *A.*2d 771 (citations omitted). That duty applied even though BackTrack was simply reporting the remarks made by Hyman and DeFalco. *See Kotlikoff v. Cmty. News,* 89 *N.J.* 62, 66 n. 1, 444 *A.*2d 1086 (1982) ("It is a well settled rule of defamation law that one who republishes libelous matter is subject to liability as if he had published it originally, even though he attributes the libelous statements to the original publisher."). Moreover, as the Court noted in *Lawrence, supra,* 89 *N.J.* at 461, 446 *A.*2d 469, "the defense of truth does not refer to the truthful republication of a defamatory statement but to the truth of the statement's contents" (citing *Restatement (Second) of Torts, supra,* § 578 cmt. b).

BackTrack next contends that its motion for a directed verdict at the end of plaintiffs' case should have been granted. The argument is two-fold. BackTrack first claims that plaintiff was required to introduce expert testimony as to the appropriate standard of care for the financial industry. It also argues that plaintiffs produced no proof that BackTrack acted recklessly or negligently. We reject both claims.

In *Sisler, supra,* 104 *N.J.* at 275–79, 516 *A.*2d 1083, the Court discussed the appropriate standard of care required in defamation cases where the speech involved private person plaintiffs but matters in the public interest. The Court stated:

> Expert testimony would be appropriate in those defamation cases when the litigation focuses on issues beyond the experience and comprehension of the average person.... In such cases, expert testimony regarding journalistic practices and customs may properly inform a jury, even when the burden of proof is actual malice.
>
> [*Id.* at 278, 516 *A.*2d 1083 (citation omitted).]

However, this is not such a case. The information contained in the BackTrack reports did not involve esoteric subjects beyond the ken of average jurors.

Regarding proof of BackTrack's negligent or reckless conduct, plaintiffs' case in chief included the deposition testimony of BackTrack's president, Randy Shain, and other BackTrack employees, that clearly indicated BackTrack did little, if anything,

to verify the information supplied to it, and which it, in turn, supplied to its clients. There was ample evidence to sustain plaintiffs' burden of proof.

## III.

BackTrack claims the judge erred by failing to dismiss certain claims pursuant to the one-year statute of limitation for defamation. Although BackTrack contends it raised this argument when it first sought summary judgment, and again upon reconsideration before trial, a fair reading of the transcript reveals such was not the case. In fact, before trial, BackTrack's premised its argument on the "single publication rule," whereby a libel appearing in "a mass publication" such as a book or newspaper supports a single cause of action that arises upon the first publication. *Cipriani Builders, Inc. v. Madden,* 389 *N.J.Super.* 154, 175–76, 912 *A.*2d 152 (App.Div.2006). BackTrack argued that since its first report was published in 2002, and plaintiffs did not file suit until 2006, the complaint should be dismissed as untimely.

The judge properly determined that the "single publication rule" provides a "limited exception" to the "general" rule that "any repetition of a defamatory statement gives rise to a new cause of action." *Id.* at 175, 912 *A.*2d 152. The exception "does not apply to the repetition of defamatory statements in any form other than multiple distributions of the same material by the mass media or a single communication heard at the same time by two or more persons." *Id.* at 175–76, 912 *A.*2d 152. Thus, the judge correctly denied BackTrack's motion.

At trial, BackTrack did not object to the admission of the earlier reports, and, indeed, utilized them during the questioning of witnesses. Since the contents of the reports were so similar, the trial proceeded without any particular discrimination between the pre- and post–2005 reports. When BackTrack raised an argument regarding the admissibility of pre–2005 reports after plaintiffs rested, the judge evidenced some understandable consternation.

He concluded that any instruction to the jury at that late stage would only be confusing.

Were we not reversing and remanding the matter for a new trial on damages, we might conclude that BackTrack's failure to properly present and preserve the issue before the trial judge should prevent consideration on appeal. We fail to see how the issue in any way impacts our conclusions regarding BackTrack's liability. However, since there may be a new trial on damages, we provide appropriate guidance.

We agree that plaintiffs' claims are limited to damages resulting from BackTrack reports issued within one-year of the filing of the complaint. Claims regarding libelous comments appearing in earlier reports are time-barred.[8] It follows, therefore, that evidence regarding damages plaintiffs suffered prior to 2005 and publication of the actionable reports is inadmissible. We hasten to add that by providing this guidance, we are not making evidence rulings in advance of any re-trial. Whether any particular evidence is admissible rests in the sound discretion of the trial judge. *Hisenaj v. Kuehner,* 194 *N.J.* 6, 12, 942 *A.*2d 769 (2008).

## IV.

BackTrack argues that the award of punitive damages must be set aside because of improper and prejudicial remarks made by plaintiffs' counsel in summation. Because any award of punitive damages must abide the result of the new trial on damages, we vacate the punitive damages portion of the judgment. *See N.J.S.A.* 2A:15–5.13(c) ("Punitive damages may be awarded only if compensatory damages have been awarded in the first stage of the trial."); *Smith v. Whitaker,* 160 *N.J.* 221, 245, 734 *A.*2d 243 (1999) (holding that "an award of compensatory damages

---

[8] As we explain in Point V below, we reject plaintiffs' alternative argument on this issue, i.e., that they are entitled to the benefit of the "discovery rule" and may assert claims based on libels that appeared in the earlier, otherwise time-barred, reports.

[i]s a predicate for a punitive damages award"). Nonetheless, we address BackTrack's specific argument in order to provide guidance.

The punitive damages trial was limited to summations, during which defense counsel told the jury, "you sent your message. BackTrack has heard [your] message [about] the manner in which it does its business. . . . You sent it loud, and clear, and I submit to you that that's enough at this point."

Citing defense counsel's assertion that the jury had already "sent a message," plaintiff's counsel argued that the damage awards were "a drop in BackTrack's pocket" compared to the $70 million it earned from "pumping out" 20,000 reports without regard to their veracity. Referencing specific employees of Back-Track, plaintiff's counsel said:

> [Defense counsel] says that BackTrack . . . is getting your message. Where? Where are all the people that were here when the evidence was coming in. Where did Mr. Shain go? Where's the head of operations? Ms. Drucker? Where are they?
>
> I mean, we put in this case, and Mr. Buckner, and Mr. Ryan are waiting for your verdict every day. When you came out with your good questions, they're sitting here. They're waiting for your verdict. Where's BackTrack? They could care less.

After the jury was charged and began deliberations, defense counsel requested a curative charge regarding opposing counsel's comments. Noting that the comments "pick[ed] up on something that was said earlier," and that defense counsel failed to make the objection before the jury began to deliberate, the judge declined to give any instruction.

■ "Although attorneys are given broad latitude in summation, they may not use disparaging language to discredit the opposing party, or witness, or accuse a party's attorney of wanting the jury to evaluate the evidence unfairly, of trying to deceive the jury, or of deliberately distorting the evidence." *Rodd v. Raritan Radiologic Assocs., P.A.,* 373 *N.J.Super.* 154, 171, 860 *A.2d* 1003 (App.Div.2004) (citations omitted); *accord Szczecina v. PV Holding Corp.,* 414 *N.J.Super.* 173, 178, 997 *A.2d* 1079 (App.Div.2010)

("[I]t is improper for an attorney to make derisive statements about parties, their counsel, or their witnesses.").

 "To remedy the prejudice caused by untrue statements or inferences, trial courts may, depending on the severity of the prejudice, issue a curative instruction or grant a mistrial." *Bender v. Adelson*, 187 *N.J.* 411, 433, 901 *A.*2d 907 (2006). On appeal, we defer to the discretion of the trial judge who has the "feel of the case." *Khan v. Singh*, 397 *N.J.Super.* 184, 202, 936 *A.*2d 987 (App.Div.2007) (citation omitted). However, when summations remarks "cross the line beyond fair advocacy and comment, and have the ability or 'capacity' to improperly influence the jury's 'ultimate decision making,' *Bender, supra*, 187 *N.J.* at 416, 435, 901 *A.*2d 907, the trial judge must take action." *Risko v. Thompson Muller Auto. Group, Inc.*, 206 *N.J.* 506, 522, 20 *A.*3d 1123 (2011).

 Here, the comments were highly improper. The absence of a party is not in the least evidential, and BackTrack had an absolute right to absent itself from the proceedings without risking attack from plaintiffs' counsel. We trust plaintiffs' counsel will refrain in the future from such comments.

## V.

 In their separate appeal, plaintiffs contend the judge erred by dismissing their defamation claims against the Hyman Beck defendants based on expiration of the statute of limitations. They argue that the limitation period should have been tolled until they discovered the existence of the BackTrack reports in fall 2005. Application of the discovery rule, they contend, would make the filing of their complaint timely. Recognizing that no reported case has applied the discovery rule to a cause of action for defamation, plaintiffs ask us to "use this case as the vehicle to address the inequities created by" prior precedent. We refuse to do so.

"The discovery rule is perhaps the most familiar equitable doctrine that has been applied to the operation of a statute of limitations, and it has been used to toll the otherwise applicable time frames." *Fox v. Millman*, 210 *N.J.* 401, 415, 45 *A.*3d 332 (2012). "[T]he 'equitable principle of the discovery rule . . . delays accrual of a cause of action' until the injured plaintiff discovers, or should have reasonably discovered, 'a basis for an actionable claim.'" *Ibid.* (quoting *Guichardo v. Rubinfeld*, 177 *N.J.* 45, 51, 826 *A.*2d 700 (2003)).

In this case, it is undisputed that statements attributed to the Hyman Beck defendants contained within the BackTrack reports resulted from interviews conducted in 2002. Those statements were repeated thereafter in several reports, the existence of which plaintiffs first discovered in 2005.

Although the trial judge recognized the potential inequity in refusing to apply the discovery rule, he believed he was compelled to follow prior precedent, in particular, *Lawrence v. Bauer Publishing & Printing, Ltd.*, 78 *N.J.* 371, 396 *A.*2d 569 (1979). In *Lawrence*, the Court reversed our application of the discovery rule to an action for defamation substantially for the reasons expressed in the dissent by Judge Ard. *Id.* at 371–72, 396 *A.*2d 569.

In his separate concurring opinion, Justice Pashman explained that courts may apply the discovery rule to personal injury actions because the Legislature expressly provided that the two-year limitations period commenced when "the cause of . . . action shall have accrued." *Id.* at 374, 396 *A.*2d 569 (Pashman, J., concurring) (quoting *N.J.S.A.* 2A:14–2). "Due to the absence of any legislative specification as to the precise time when a claim 'accrues,' our courts, in the exercise of their judicial function, have developed a rule which best serves the interests of justice." *Ibid.* (Pashman, J., concurring) (citations omitted).

By contrast, the Legislature has "fixed a precise date on which the limitations period begins to run[ ]" in a defamation action, which "must be brought within one year of 'the publication' of the alleged libel." *Id.* at 374–75, 396 *A.*2d 569 (Pashman, J., concur-

ring) (quoting *N.J.S.A.* 2A:14–3). "Hence, the discovery rule is inapplicable to libel actions." *Id.* at 375, 396 *A.*2d 569 (Pashman, J., concurring); *see also Williams v. Bell Tel. Lab., Inc.,* 132 *N.J.* 109, 120, 623 *A.*2d 234 (1993) (where the Court "perceive[d]" application of the discovery rule to defamation actions as not "being entirely without merit," but concluded it would not "revisit[ ] ... *Lawrence* " until "the question [was] squarely presented and the appeal turn[ed] on its answer").

Plaintiffs have brought to our attention a number of out-of-state cases that applied the discovery rule to defamation claims, particularly where the "plaintiff was unlikely to be aware of the publication due to its confidential[ity]," which, they argue, characterized the BackTrack reports. However, we refuse to depart from Justice Pashman's clear exegesis of *N.J.S.A.* 2A:14–3 for two primary reasons.

First, nearly thirty-five years have passed since *Lawrence* was decided, yet, the Legislature has not amended the statute. "The Legislature 'knows how to express its disagreement with case law by amending a statute if it believes a court has misconstrued its intent.'" *State v. Galicia,* 210 *N.J.* 364, 382, 45 *A.*3d 310 (2012) (quoting *Johnson v. Scaccetti,* 192 *N.J.* 256, 277, 927 *A.*2d 1269 (2007)). "We assume from such a 'long acquiescence on the part of the Legislature or ... failure to amend the statute' that an earlier judicial construction 'is in accord with the legislative intent.'" *Harrison v. A & J Friedman Supply, Co.,* 372 *N.J.Super.* 326, 332 n. 2, 858 *A.*2d 567 (App.Div.2004) (quoting *In re Keogh–Dwyer,* 45 *N.J.* 117, 120, 211 *A.*2d 778 (1965)).

Second, in light of the Court's decision in *Lawrence,* as a court of intermediate appellate jurisdiction, we do not presume to expand application of the discovery rule to defamation claims. Clearly, such determination would be more appropriately made by the Court. *See, e.g., Tannen v. Tannen,* 416 *N.J.Super.* 248, 272, 3 *A.*3d 1229 (App.Div.2010) (refusing to adopt principles of the *Restatement (Third) of Trusts* and apply them to the alimony statute, *N.J.S.A.* 2A:34–23(b)), *aff'd o.b.,* 208 *N.J.* 409, 31 *A.*3d 621

(2011); *Riley v. Keenan,* 406 *N.J.Super.* 281, 297, 967 *A.*2d 868 (App.Div.) (noting that an appellate court "should normally defer to the Supreme Court ... with respect to the creation of a new cause of action") (citing *Tynan v. Curzi,* 332 *N.J.Super.* 267, 277, 753 *A.*2d 187 (App.Div.2000)), *certif. denied,* 200 *N.J.* 207, 976 *A.*2d 384 (2009).

We affirm dismissal of plaintiffs' claims against the Hyman Beck defendants.

## VI.

In sum, we affirm the jury's verdict as to liability and reverse the judgment on damages, remanding the matter for a new trial on damages in accordance with the guidance we have issued. We vacate the judgment on punitive damages. We affirm the dismissal of plaintiffs' claims against the Hyman Beck defendants.

Affirmed in part; reversed in part; remanded. We do not retain jurisdiction.