NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0283-15T1

ANDREA DAVIDOVICH, a/k/a
ANYA DAVIDOVICH,

     Plaintiff-Respondent,

v.

ISRAEL ICE SKATING FEDERATION,
BORIS CHAIT, IRINA a/k/a IRENE
CHAIT, and GALIT CHAIT,

     Defendants-Appellants.

_____

| **APPROVED FOR PUBLICATION** |
| :---: |
| **June 23, 2016** |
| **APPELLATE DIVISION** |

Argued January 4, 2016 — Remanded March 5, 2016
Reargued May 31, 2016 — Decided June 23, 2016

Before Judges Sabatino, Accurso and
O'Connor.

On appeal from the Superior Court of New
Jersey, Law Division, Bergen County, Docket
No. L-8543-14.

Brian D. Spector argued the cause for
appellants (Spector & Ehrenworth, P.C.,
attorneys; Mr. Spector, Douglas A. Goldstein
and Danielle M. Koch, on the briefs).

Christopher J. Dalton argued the cause for
respondent (Buchanan Ingersoll & Rooney PC,
attorneys; Stuart P. Slotnick, Mr. Dalton,
Tanya D. Bosi, and Lauren A. Isaacoff, on
the briefs).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

Plaintiff is a teenage ice skater of dual United States-Israeli citizenship. She filed this complaint in the Law Division seeking to break free from the Israeli ice skating federation she represented in the pairs event at the 2014 Winter Olympics. Plaintiff, whose Israeli skating partner severed their relationship shortly after the Olympics, now wishes to compete internationally for the United States.

For the past two years the federation has fiercely resisted plaintiff's efforts to gain her release, even though it has no apparent plans or desire to have her skate under its flag again. The federation contends that if it were to release plaintiff unconditionally, doing so will encourage other skaters in whom it has invested substantial resources to switch their affiliations to other countries, for their sole personal advantage and to the federation's detriment. Meanwhile, plaintiff has not skated internationally for more than two years.

Faced with these and other difficult time-sensitive issues, the trial court granted partial summary judgment to plaintiff last September. The court ordered the federation, over its strenuous objection, to issue plaintiff a release permitting her to skate for another country.

The court rejected the federation's asserted business reasons for not releasing plaintiff, finding its motives "inscrutable." In addition, the court declined to grant summary judgment to either party on plaintiff's separate claim of tortious interference with her prospective economic opportunities, directing that claim be resolved by a jury. We granted the federation leave to appeal, but kept the court-ordered release provisionally in place.

Following oral argument in January, we ordered plaintiff, with her acquiescence, to attempt to exhaust remedies that might have been available to her under the then-existing rules of the sport's umbrella organization, the International Skating Union ("ISU"). After she took certain steps to do so without success, we temporarily remanded the case for an evidentiary hearing to resolve factual disputes relating to the adequacy of her efforts.

On remand, the trial court ruled this spring that plaintiff has sufficiently attempted, both directly and indirectly through requests she made of the United States team, to obtain a release from the ISU. The federation appealed that separate ruling and we heard reargument in late May after post-remand briefing.

In the past two weeks, the posture of this case changed dramatically in several respects. Most importantly, at its June

2016 biannual meeting, the ISU Congress revised its eligibility rules for skaters who have previously competed for other federations. In particular, the new version of the rules instructs that after a twelve-month waiting period has run, a skater's request to be released from her prior federation "shall not be unreasonably denied." In addition, the revised rule now states that the ISU may waive the release requirement in undefined "special circumstances."

A few days after these rule changes were adopted, the United States skating organization tendered to the ISU a formal request to grant such a release for plaintiff, despite the federation's continued opposition. As of this writing, that request remains pending before the ISU. Meanwhile, the rosters of each federation for the coming international skating season are to be fixed as of July 1.

For the reasons that follow, we reverse the trial court's partial summary judgment order and remand this matter for disposition of the remaining counts of the complaint. We do so principally because of (1) the strong policies disfavoring judicial interference into the internal affairs of sporting organizations, (2) the need for possible non-judicial remedies to be exhausted, and (3) the presence of genuine and hotly-contested issues of material fact and business justification.

Although there is discovery left to complete, the present record supplies the following details pertinent to our interlocutory review.

<u>Plaintiff, the Federation, and the ISU</u>

Plaintiff Andrea (or "Anya") Davidovich is a dual citizen of the United States and Israel. She is presently nineteen years of age and has resided in New Jersey her entire life. Her parents, who are immigrants with Russian and Israeli backgrounds, likewise reside in New Jersey.

Plaintiff has trained as a figure skater since she was five years old. After she became a teenager, plaintiff joined defendant Israel Ice Skating Federation ("the Federation" or "the IISF"), for whom she skated in various junior competitions.

The Federation is a private organization that trains ice figure and speed skaters to take part in international ice skating competitions as representatives of Israel. Although it is based primarily in Israel, the Federation also trains skaters at facilities in the United States. Since 2002, defendant Boris Chait has served as the Federation's president. Boris's wife, defendant Irina (also known as "Irene") Chait, serves as the Federation's "team leader and chaperone" who accompanies the team members to competitions. Their daughter, defendant Galit

Chait, is an ice dancing coach and choreographer for the Federation as well as other teams.

At the age of sixteen, plaintiff was selected by the Federation to be part of a pairs team with another skater, Evengi Krasnopoloski.[1]  In July 2013, plaintiff, and her mother as her adult guardian, jointly signed a one-page ISU form document entitled "Declaration for Competitors and Officials entering ISU Events."  The Declaration was counter-signed by Anna Slavin, the General Secretary of the Federation.  No one signed the document for the ISU.

Among other things, the Declaration acknowledged that the parties who signed the document accepted the terms and provisions of the ISU Constitution.  The signatories also recognized the Court of Arbitration for Sport ("CAS") as having the authority "to issue final and binding awards involving the ISU, its Members and all participants in ISU activities, excluding all recourse to ordinary courts."

The ISU is the exclusive international sport organization recognized by the International Olympic Committee to administer figure skating and speed skating sports throughout the world. Int'l Skating Union Const. § I, art. 1, para. 1.  The ISU is

_____

[1] At various places in the record his first name is alternatively spelled "Evengy" and his last name is spelled "Krasnopolsky."

A-0283-15T1

composed of individual national associations (known as "Members"), which administer these sports at the national level and which "recognize that all international matters are under the sole jurisdiction and control of the ISU." Skaters who compete for a Member are considered members of that individual organization. Int'l Skating Union Gen. Regs. § D, rule 109, para. 2(a).

The ISU is a Swiss association established in accordance with Article 60 of the Swiss Civil Code, placing it under the jurisdiction of Switzerland. The ISU's legal residence is Lausanne, Switzerland. Int'l Skating Union Const. § I, art. 1, para. 6.

The ISU's stated objectives are "regulating, governing and promoting the sports of Figure and Speed Skating and their organized development on the basis of friendship and mutual understanding." Id. at § I, art. 3, para. 1. According to its governing documents, the ISU works to "broaden[] interest in Figure and Speed Skating sports by increasing their popularity, improving their quality and increasing the number of participants throughout the world." Ibid.

The ISU "does not approve of interference in its sports based on political or any other grounds and will make every effort to avoid such interference." Id. at § I, art. 3, para.

3. It functions within the sport essentially as both an adjudicative and legislative body, listing among its "Methods and Activities" such functions as the "settlement of differences" and the "publication of official decisions."  Id. at § I, art. 4, para. 1(e).

The ISU has issued a set of general regulations.[2]  The regulations are designed to "govern the Figure Skating and Speed Skating Branches of the ISU and are binding to all Members and affiliated clubs as far as international matters are concerned." Additionally, the ISU periodically issues "Communications" regarding the proper interpretation of ISU rules.  Int'l Skating Union Const. § VI, art. 27, para. 1.

The ISU is governed by two bodies: a Congress and a Council.  The Congress has primary "decision-making power regarding any matter[,]" but normally dictates principles and directions, leaving the Council to determine the details.  Id. at § VII(A), art. 29, para. 21.  The Council governs the organization in between meetings of the Congress, and consists

---

[2] The ISU collectively refers to its Constitution, Regulations, and Communications, among other rules and policies, as the "ISU Statutes."  Id. at § VII, art. 38, para. 1.  Members, their skaters, and all other participants are bound by the Statutes, as is required by Article 7 of the ISU Constitution.

A-0283-15T1

of a president and several other elected leaders. Id. at §
III(B), art. 16, para. 1.

ISU Rule 109 applies to participation in international
skating competitions. As it was worded before the June 2016
revisions, Rule 109(1) provided in pertinent part:

> [t]he International Competitions, listed in
> Rule 107, paragraphs 5, 6, 7, 9, 10, 11 and
> 12 organized by Members, may be entered <u>only</u>
> <u>by Competitors who belong to a Member and</u>
> <u>for whom the entry can be made only through</u>
> <u>the respective Members</u>. For participation
> in the Olympic Winter Games, Rule 126
> applies.
>
> [<u>Int'l Skating Union Gen. Regs.</u> § D, rule
> 109, para. 1. (emphasis added).]

Meanwhile, ISU Rule 126, which governs eligibility for the
Olympics, specifies that entry in the Winter Games is subject to
the requirements of the Olympic Charter, as well as the
applicable ISU Regulations. <u>Int'l Skating Union Gen. Regs.</u> § E,
rule 126, para. 2. "Only Competitors from Members may
participate in the Skating events of the Olympic Winter Games."
<u>Id.</u> at para. 7.

According to the Olympic Charter, "[a]ny competitor in the
Olympic Games must be a national of the country of the [team]
which is entering such competitor." <u>Olympic Charter</u>, Rule 41(1)
(2015). Consequently, plaintiff cannot skate in the Olympics

A-0283-15T1

for any country other than the United States or Israel, even if her partner is a citizen of some other country.

### Plaintiff's Skating at the 2014 Olympics, Her Pairs Partner's Ensuing Departure and Her Efforts to Find a New Partner

Plaintiff skated for the Federation with Krasnopoloski in various international pairs competitions in 2013. The two of them did very well, placing seventh in the European Championships in Budapest in January 2014 and winning a monetary prize. As a result of their successes, plaintiff and Krasnopoloski qualified to represent the Federation at the February 2014 Winter Olympics in Sochi, Russia. As such, they were the first figure skating pair to ever represent Israel in the Olympics. The two of them competed and placed fifteenth in Sochi.

Shortly after the Olympics concluded, Krasnopoloski announced that he was ending his skating partnership with plaintiff, asserting that he no longer wished to train with the pair's coach. Efforts to reunite Krasnopoloski and plaintiff failed, although the parties disagree about who was responsible for those efforts and why they were unsuccessful. In any event, plaintiff attempted to find a different partner, advertising her interest through a profile she posted on a website for competitive skaters.

A-0283-15T1

For reasons that are sharply disputed, the Federation and plaintiff effectively discontinued their association soon after the Olympic Games. According to plaintiff, defendants instructed skaters and other persons with the Federation not to speak with her and excluded her from training and other activities. On the other hand, the Federation insists that plaintiff herself withdrew from the Federation's activities, although it agrees that it no longer desires to have her represent Israel in skating competitions.

Although the record is not fully developed in this respect and the details are not central to the legal issues now before us, it appears that various personal conflicts arose during plaintiff's tenure with the Federation. The disagreements included defendants' concerns about plaintiff's interactions with her teammates and coaches. Plaintiff, on the other hand, maintains that defendants and the coaches treated her too harshly, and have defamed and disparaged her.

Plaintiff briefly attempted to skate in domestic events with different partners. These included, in succession, two American male skaters affiliated with the United States Figure Skating Association ("USFSA"), another Member of the ISU.

To be authorized to skate for the United States or another Member country in international competitions or in the next Olympics, plaintiff must comply with certain ISU provisions requiring her to be "released" by her former team, here the Federation. Specifically, prior to its June 2016 revision, ISU Rule 109, Paragraph 2(c) provided, among other things, that if a partner in a pair skating or ice dance couple "has already represented another Member, regardless of the discipline," that partner must: (1) obtain a "permit from the Member the Skater represented" and (2) not compete for a "waiting period [of] 12 months from the day of the last competition in which the Skater represented another Member." Int'l Skating Union Gen. Regs. § D, rule 109, para. 2(c). These restrictions applied even if the partner has citizenship or residency in the new Member's territory. Ibid.

ISU Communication No. 1420[3] similarly described the procedure for obtaining permission from a Member that the skater previously competed for to skate for another Member. The procedure applies to "any present citizen and skater of the Member who has in the past represented another ISU Member in an

_____

[3] Apparently, the ISU intends to amend Communication 1420 soon to conform to the June 2016 revisions made to Rule 109.

international competition and/or ISU championships and whom the Member intends to enter in international competitions and/or ISU Championships in the coming season as a representative of the Member."

For skaters applying for clearance to compete in pairs and dance couples, Rule 109 prescribed that "<u>Members</u> may file the application [for release] at any time. Of course if the waiting period of 12 months applies, the application can be filed only after such period has been reached." <u>Int'l Skating Union Communication No. 1420</u>, Rule 109, § A, para. c, § A, para. c (emphasis added). Skaters in situations requiring a release from a former Member were eligible to compete in international competitions "only after the applying Member has submitted satisfactory documentation and received from the Secretariat an ISU Clearance Certificate[.]" <u>Id.</u> at para. d.

The ISU Council was authorized (and remains authorized under amended Rule 109) in certain circumstances to exempt particular skaters from these waiting period and release requirements. In that vein, paragraph 5 of Rule 109 stated that "Exceptions to Paragraphs 2 & 3 of this Rule may be granted by the Council, which may also enter a Competitor for an event[.]" <u>Int'l Skating Union Gen. Reqs.</u> § D, rule 109, para. 5. ISU

Communication 1420 further addressed the exception process and standards, as follows:

> Although . . . the Council [has] the powers to grant exceptions from the requirements of citizenship, residence, permits by Members and waiting periods, <u>it has always been the policy of the Council not to grant any exception simply for the skater to change Members. Exceptions might be granted only in cases where a serious hardship would occur without such exception</u> (e.g. such as application of a new rule after certain action[s] have been taken in good faith prior to adoption of the rule, <u>unjustified denial of a permit by a Member to a skater who has not represented that Member at all or for a number of years</u>, etc.).
>
> [<u>Int'l Skating Union Communication No. 1420</u>, Rule 109, § D (emphasis added).]

Additionally, the ISU Constitution more generally authorizes the ISU Council to modify or suspend its rules in "rare" cases of "exceptional circumstances[.]"  See <u>Int'l Skating Union Const.</u> § III(B), art. 17, para. 1(q).

<u>The CAS Arbitration Process</u>

Decisions of the ISU Council "shall not be subject to appeal except as explicitly set forth in other provisions of the ISU statutes."  <u>See</u> § III(B), art. 17, para. 2(a).  Appeals of a Council decision must be heard by the CAS.  <u>Id.</u> at § V, art. 25, para. 1.  Through the ISU's Constitution, all Members and skaters are directed to submit any disputes or claims that are not covered by the ISU's rules and regulations to the CAS for

14                                      A-0283-15T1

final binding arbitration.  Id. at § V, art. 26, para. 1. The CAS is empowered, among other things, to hear and decide appeals of "any decision of the Council declaring ineligibility of a Skater, Official, Office Holder or other participant in ISU activities." Id. at § V, art. 25, para. 2(c) (emphasis added).

CAS decisions are "final and binding to the exclusion of jurisdiction of any civil court." Id. at § V, art. 25, para. 6. However, CAS decisions may be appealed to the Swiss Supreme Court, also known as the Federal Tribunal. See CMS Cameron McKenna LLP, CMS Guide to Arbitration 898 (2012); Antonio Rigozzi, Challenging Awards of the Court of Arbitration for Sport, J. Int'l Disp. Settlement 1(1): 217-65 (2010).

Judicial review by the Swiss courts of CAS arbitral decisions is severely restricted, and such decisions can only be challenged on limited specified grounds.  Those limited grounds include, among other things, a "violation of the principle of equal treatment of the parties or the right to be heard."  CMS Cameron McKenna LLP, supra, at 898-99.  The arbitrariness of an award is not reason in and of itself for annulment under Swiss law. Id. at 899.

### Plaintiff's Unsuccessful Attempts to Procure a Release from the Federation

After the Sochi Olympics and Krasnopoloski's withdrawal, plaintiff's parents tried to obtain for her the necessary

release from the Federation. They sent this email request to Boris Chait on April 30, 2014:

> Dear Mr. Chait:
>
> It has been 2.5 months since Evengi Krasnopolsky officially ended partnership with [plaintiff]. While [plaintiff] (as everyone in our family) had been really proud to be a member of the Israeli Figure Skating Federation and to represent [the] state of Israel, she has decided to pursue other opportunities to advance her career.
>
> <u>Please issue an official Release Form for [plaintiff] as soon as possible</u>.
>
> We would like to thank the Israeli Federation and you personally for a great experience and wish you continuous success.
>
> With kind regards,
> [Sasha] and Marina Davidovich.
>
> [(Emphasis added).]

The Federation did not provide an immediate decision in response. Instead, it contacted the ISU to obtain clarification as to whether the request should have come from plaintiff herself rather than from her parents, or whether it should come instead from "[an]other member federation." The ISU's representative replied in an email stating, "If the Skater wants to leave the Federation in order to represent an[]other Member, then <u>it is the new Member who should ask</u> for the release letter." (Emphasis added).

A-0283-15T1

Following this clarification, plaintiff obtained the assistance of the USFSA to seek a release from the Federation on her behalf. In a letter dated May 28, 2014, the USFSA requested the Federation to "grant the required release letter so [plaintiff would] be able to compete internationally in the future as a member of U.S. Figure Skating."

The Federation referred the USFSA's request to its Board, which met shortly thereafter. The Board decided to reject the request, noting that it was not inclined to do so at that time, even if plaintiff paid what it considered a "standard" or "customary" release fee. A translated version of the Board minutes on this decision reads as follows:

> [Plaintiff] asked for a release through the American Federation. We need to answer the Federation with [a] decision that <u>we are not releasing her for the moment, not even for the standard amount of $20,000</u>. It is the <u>custom to request for an athlete at this level about $30,000</u>. We will check with the international organization what could happen if we release her and if we don't.
>
> It has been decided that <u>in light of the high cost for financing athletes</u>, the board must [make] the decision that if the athlete wants to transfer to another Federation, the following rules apply:
>
>> 1. A team member that wishes to leave will <u>pay a fine to Israel Ice Skating Federation in the amount of $25,000</u>. Level A — World Championship, Junior World

A-0283-15T1

> Championship, European
> Championship, the Olympics.
>
> 2. A team member that participated
> in international competitions and
> Grand Prix will <u>pay a fine of
> $15,000</u>.
>
> 3. The release [request] will be
> examined by the [Federation's]
> non-profit organization board
> after a discussion on the matter.

[(Emphasis added).]

Following the Board meeting, the Federation issued a formal denial letter to plaintiff on July 2, 2014. The letter highlighted several reasons for the denial, including the investment made by the Federation in plaintiff's skating career and also the fact that she had not yet completed the one-year waiting period prescribed by the ISU rules. The letter stated, in pertinent part:

> We would like to share some thoughts about your request to release [plaintiff]. Twelve months ago, we undertook the project of [plaintiff] & Evengi Krasnopolsky.
>
> Evengi was [an] established skater with many years of experience—single & pair skating, while [plaintiff] <u>was [a] junior skater with very little capability & only a few junior competitions. The Federation's athletes, coaches, [and] technical committee staff did a great job to develop the pair</u>. They placed 7th in the Europeans and qualified for the Sochi Olympics, which was quite an accomplishment.

> *We cannot overestimate all the work that was done and the time invested by everybody at the Federation. We are a small Federation. Every athlete and every dollar spent is very crucial for our existence.*
>
> *It is harmful to the Federation if an athlete comes to skate for the IISF[,] learns new skills[,] and reach[es] new goals and then eventually leaves the Federation.*
>
> Under these circumstances at this time, we can't grant a release for [plaintiff]. In any event[,] under ISU rules, [plaintiff] has to sit out one year from her last competition. So there's time to consider this request in the future.
>
> We would address this issue again because we always were, are and will be a pro-athlete Federation.
>
> Thank you for your understanding.
>
> Anna Slavin on behalf of the board members.
>
> [(Emphasis added).]

After this exchange, Boris Chait sought further clarification from the ISU, asking if the Federation was obligated to release plaintiff once her one-year waiting period lapsed. The ISU's representative replied that a release is "not automatic[,]" and that even after the one-year waiting period ends, "it is up to the Member federation to decide whether or not they wish to release a Skater." In a follow-up message, the ISU representative confirmed that if the Federation decided after the waiting period not to release plaintiff, the ISU would

not issue the necessary "clearance certificate" allowing her to skate for another Member.

Plaintiff's Lawsuit and Her Continued Efforts to Seek a Release After the One-Year Waiting Period Expired

In September 2014, plaintiff, through her mother as guardian, filed in the Law Division a ten-count complaint against the Federation and the three Chaits. Among other things, the complaint asserted that the Federation has "unreasonably refused" to release her and that, as a result, she is "unable to advance her career and skate in international ice skating competitions for another team." Plaintiff further claimed that defendants have wrongfully interfered with her "ability to compete internationally for the USFSA and further her professional skating career."

The complaint sought in count one what plaintiff styled as "declaratory judgment" — but which essentially was a request for mandatory injunctive relief — compelling the Federation "to issue [her] a written release[.]" In count two, plaintiff claimed that the Federation has tortiously interfered with her prospective economic advantage, and is thereby liable to her for

monetary damages.[4]  Plaintiff demanded equitable relief and monetary damages.

Defendants denied liability and interposed a host of affirmative defenses.  Unlike plaintiff, defendants requested a jury trial.  Discovery has been partially completed, including the deposition of plaintiff and several other persons.  The individual defendants have not yet been deposed, although they submitted interrogatory responses explaining why they believe they were justified in withholding a release.

In essence, defendants maintain that they undertook reasonable steps to attempt to reunite plaintiff with her partner and that she and her parents rebuffed those efforts, that they preserved a spot for the pair through the time of the World Figure Skating Championship in March 2014, and that plaintiff never proposed a new partner to the Federation for its approval.  Defendants further stressed the resources and time they expended in training and coaching plaintiff, contending that a donation of over $60,000 her parents had made to a

---

[4] The remaining counts of the complaint, none of which were adjudicated by the trial court and are not at issue before us, included claims of intentional and negligent infliction of emotional distress by the Chaits (counts three and four), various forms of defamation by Boris Chait (counts five, six and seven), invasion of privacy and false light against Boris and Irene Chait (counts eight and nine), and negligence against all three Chaits (count ten).

separate tax-exempt organization for the benefit of Federation skaters did not sufficiently cover those expenses. Defendants also claim that plaintiff had engaged in improper behavior while she was a member of the team, and that plaintiff herself terminated her relationship with the Federation.

Plaintiff's one-year waiting period expired on February 12, 2015. That month the USFSA made a second request to the Federation to release her, which the Federation again denied.

### The Parties' Motions for Partial Summary Judgment

Before the scheduled end of discovery, defendants moved for partial summary judgment, seeking the dismissal of counts one and two of the complaint. Plaintiff cross-moved for partial summary judgment, requesting the court on count one to compel the Federation to issue her a release permitting her to skate internationally for another Member country. As to count two, plaintiff asked the court to find defendants liable for tortious interference, subject to a trial on damages. None of the other eight counts of the complaint were included in the parties' motion practice.

### The Trial Court's September 2, 2015 Decision

After hearing oral argument on the motions, the trial court issued an order and written opinion on September 2, 2015, granting plaintiff summary judgment and other relief on count

one.   The court determined there was "no legal or equitable basis for the [Federation] to continue to refuse to release [plaintiff] from her membership with the organization, and she must therefore be released immediately so that she may pursue opportunities to skate internationally on behalf of the United States of America."

The court found unpersuasive defendants' threshold argument that the Superior Court lacked jurisdiction to adjudicate the dispute because plaintiff had agreed to abide by the rules of the ISU and must exhaust her administrative appeals through that body.   The court deemed those ISU provisions "simply not dispositive of . . . [p]laintiff's rights and privileges as a citizen of the United States of America and a resident of the State of New Jersey."

The trial court deemed plaintiff's request in count one for a declaratory judgment justiciable.   The court distinguished plaintiff's circumstances from non-justiciable controversies involving membership disputes within private associations.   In that regard, the court noted that plaintiff had not been a member of the Federation since February 2014 and that no "membership decision" had been made.

Substantively, the trial court concluded in essence that the Federation's refusal to allow plaintiff to skate for another

Member of the ISU constituted a serious injustice that demanded a remedy. The court specifically determined from the motion papers that the Federation was "withholding a release with <u>an inscrutable motive</u>, despite the termination of the [p]laintiff's membership with that federation." (Emphasis added).

Additionally, the court ruled that plaintiff had not waived, "in the form of an arbitration agreement or otherwise," her right to litigate her rights in the Superior Court, regardless of whether an ISU appeal process existed and whether such a process was fair or reasonable. The court reasoned that (1) the parties "vigorously dispute[d] whether any contract at all existed between [p]laintiff and the [Israeli Federation], or the ISU"; (2) defendants' characterization of plaintiff's signing an agreement "with a non-party to this litigation" (meaning the ISU) as "some sort of binding administrative proceeding" was unpersuasive; (3) the Federation had not "deal[t] in good faith and fairly with" plaintiff; and (4) plaintiff's "commercial viability, as well as [her] rights and privileges as [a] U.S. Citizen[]" were being "unlawfully restricted," such that "mere reference to the rules and regulations codified by a non-party entity [(the ISU)] [we]re insufficient" to meet the standards under New Jersey case law governing the enforceability of arbitration provisions.

The trial court declined, however, to grant summary judgment to either side on count two. The court found that plaintiff needed to proceed to trial on the issue of tortious interference because it was not clear from the record that the Federation's failure to release her caused her to lose an "ascertainable prospective economic advantage."

The Court-Ordered Release

Defendants initially did not carry out the trial court's order directing them to issue plaintiff's release. Instead, they sought a stay of that order, which the court denied. The court then imposed sanctions because of their failure to comply promptly with the initial order.

Defendants eventually issued the court-ordered release under protest on September 25, 2015. Consistent with the terms of the trial court's directive, the release stated as follows:

> Dear International Skating Union Member:
>
> Please let this letter serve as the permit, or release, required by International Skating Union ("ISU") Rule 109(2)(c) (as clarified by ISU Communication No. 1420(B)(1) and (3) to allow Andrea Davidovich ("Davidovich") to compete in any ISU Figure Skating and Speed Skating Sports and Olympic Winter Games ("International Competitions") on behalf of any ISU member (as defined in Article 1, Sections 1 and 3 of the ISU Constitution), including but not limited to United States Figure Skating Association ("USFSA"). This release is not limited.

25

Davidovich previously skated in International Competitions on behalf of the Israel Skating Federation ("IISF"). Davidovich has not competed in any International Competition on behalf of the IISF since the 2014 Olympic Winter Games and is no longer affiliated with the IISF.

With this letter, the IISF releases Davidovich pursuant to all ISU Rules and give her permission to compete in International Competitions on behalf of any other ISU member. Accordingly, there is no restriction or impediment to Davidovich skating as a member of the USFSA in any event.

This Interlocutory Appeal

Defendants moved for leave to appeal the trial court's grant of relief to plaintiff on count one, and its denial of their motion to dismiss her tortious interference claims in count two. Defendants also sought an appellate stay of the court-mandated release. The Federation issued a press release announcing its pursuit of an appeal, emphasizing its position that the trial court had erred in intervening in this sports-related controversy.[5] Plaintiff did not cross-appeal the denial of her own motion for partial summary judgment on count two.

We granted defendants leave to appeal but denied a stay under Rule 2:9-5. In doing so, we noted in our corresponding

---

[5] Plaintiff contends that this press release and a later one issued by the Federation have hindered her efforts to find a new partner and pursue her skating career.

order that defendants had "not demonstrated that the balance of equities warrants altering the status quo resulting from the trial court's order during the interim period while this accelerated appeal is considered on its merits."  We also noted defendants' failure to show they would suffer immediate and irreparable harm during the pendency of the appeal, or that the public interest compelled the entry of an appellate stay.

The First Sua Sponte Order in January 2016 Directing
Plaintiff to Attempt to Exhaust Non-Judicial Remedies

After considering the briefs and oral argument on the appeal, it became evident to this court that a critical threshold issue was whether plaintiff had a remedy with the ISU, either directly or through the USFSA.  Consequently, we issued a sua sponte order on January 6, 2016, two days after oral argument, directing plaintiff to attempt to obtain such possible remedies as a condition of her continued right to use the court-ordered release.  Plaintiff's counsel indicated at oral argument that his client did not object to doing so.

We accordingly ordered plaintiff to pursue such measures, even though we acknowledged that the provisions within the ISU did not clearly afford her as an individual skater such a pathway to redress.  Meanwhile, the Federation issued another

27

press release, incorrectly stating that our sua sponte order had "overturned" the trial court.[6]

Plaintiff thereafter submitted a letter petition to the ISU on January 27, 2016, seeking relief from the Federation's denial of a release. The letter requested that the ISU either: (1) declare that plaintiff was released from the Federation and could therefore skate for another ISU member, (2) waive the release requirement, pursuant to Rule 109(5), so that she could skate for another ISU member, in addition to providing a clearance certificate allowing her to skate in ISU events, or (3) accept or adopt the release that the Federation issued her pursuant to the trial court's order.

On a parallel track, plaintiff sent a letter request to the USFSA on that same day. She requested that the USFSA "petition the ISU" to approve any of the three options set forth in her own letter to the ISU.

In response, the USFSA declined at that point to seek relief on plaintiff's behalf from the ISU. The USFSA communicated this decision through an email to her on February 3, 2016. The email stated that plaintiff's request, as worded, "involves issues that extend beyond the interests of U.S. Figure

---

[6] Defense counsel concedes this wording in the press release was wrong.

Skating and involve actions that are broader in scope than would apply specifically to U.S. Figure Skating."

Meanwhile, on February 5, 2016, the ISU likewise declined to entertain plaintiff's request. It advised her that she must submit her request "through and with the support of a new Member [she] intend[s] to skate for[.]"

We then issued a second sua sponte order requesting counsel to address the significance of these developments. Thereafter, plaintiff submitted a clarified request to the USFSA on March 7, 2016, this time making plain that she intended only to procure a release to skate for the United States.

The Remand on Exhaustion Issues

Because the parties disputed the legal significance of these events and the sufficiency of plaintiff's efforts to exhaust potential remedies, we issued a third sua sponte order on March 15, 2016, remanding the matter temporarily to the trial court. We directed the trial court to make findings on the exhaustion issue, granting it the discretion to allow limited discovery on the subject.

As part of that discovery, the parties took de bene esse depositions of the Executive Director of the USFSA, David Raith, and the Director General of the ISU, Fredi Schmid, in April.

29

Both officials happened to be in Boston that same day for the World Figure Skating Championships.

The Trial Court's Post-Remand Decision

After conducting a two-day evidentiary hearing, the trial court concluded in a written decision dated April 22, 2016 that plaintiff had undertaken reasonable efforts to exhaust her potential non-judicial remedies. The court observed that the record, as amplified on remand, details plaintiff's "many attempts to exhaust her administrative remedies[.]" The court ruled that "[t]he simple fact that the USFSA has not pursued the matter while it awaits [a]ppellate review and ISU clearance does not undermine [her] extraordinary exhaustion efforts."

The trial court also found that the testimony of the ISU's Director General, Schmid, "proves that the ISU's involvement in this matter does not obviate" plaintiff's "need to resort to the courts, it only affirms that judicial intervention is imperative." The court found it significant that all of plaintiff's attempts to obtain a non-judicial release thus far have been fruitless and that Schmid's testimony demonstrated that there were virtually no "next steps" plaintiff could pursue.

Furthermore, the court found that "the professed inaction of both the [USFSA] and the ISU is decisive evidence that

A-0283-15T1

[p]laintiff has done all she can do." The court observed that "[t]o delay decision[] in the instant case and to permit the procedural inequities inherent in the ISU's Rules and Regulations to persist, cannot be justified[.]" The court found that plaintiff was having difficulty finding a partner because of this litigation, and that "[t]he consequence of indefinitely stayed administrative inaction is a deprivation of any genuine prospect that she may skate in the future."

### The Changes to Rule 109 at the June 2016 ISU Congress

Major developments affecting Rule 109 occurred at the ISU Congress's biannual meeting in Dubrovnik, Croatia, the week of June 6-10, 2016. In its Agenda for the meeting, the ISU Council noted the Rule's release requirement had become "legally problematic." Int'l Skating Union, Communication No. 2004, Agenda of the 56th Ordinary Congress § I(B), ¶ 86, at 50-51 (2016), http://static.isu.org/media/1006/2004-congress-2016-agenda.pdf.[7] The Council proposed a revised version of Rule 109 that would eliminate the need for a skater to obtain a release from his or her former team after a twelve-month waiting period.

---

[7] Although the Agenda did not refer to the present litigation, the post-remand record indicates the ISU had also recently been dealing with another controversial situation involving a French skater who wished to be released to skate for another country.

Although the ISU Congress did not support the proposed elimination of the release provision, it did vote at its June 2016 meeting to revise Rule 109 and set forth a "reasonableness" standard for withholding releases. The revised rule also confers upon the ISU the express authority to exempt a skater from the release requirement in undefined "special circumstances."

As revised, Rule 109 now states, in pertinent part:

1. Participation in ISU Championships, ISU Events and International Competitions

ISU Championships, ISU Events and International Competitions, listed in Rule 100, paragraph 3, and Rule 107, paragraphs 1, 4, 5, 6, 7, 8, 9, 10, 11 and 12, may be entered only by Competitors who are members of an ISU Member. The entry can be made only through that ISU Member. For participation in Olympic Winter Games and Winter Youth Olympic Games, Rule 126 respectively [sic] the provisions of the Olympic Charter and its By-Laws apply.

2. a) A Skater may compete only as a member of the ISU Member of a country of which he is a citizen or in which he has resided for at least one year.

b) In Pair Skating and Ice Dance only one partner needs to fulfil the requirements stated in paragraph 2.a). The other partner, however, must be a citizen or resident of the country of an ISU Member.

c) A Skater who has competed in any ISU Championships, ISU Event and/or International Competition for any ISU Member and who intends to compete in the future for another ISU Member needs a permit from the ISU Member he currently represented in the past, <u>which permit shall not unreasonably be denied</u>.

In addition[,] such Skater may compete for the respective ISU Member in International Competitions, ISU Events and ISU Championships only after a waiting period of twelve (12) months since the Skater competed for any other ISU Member in any such competition has elapsed.

d) . . . .

3. Skaters competing for the ISU Member of a country whose citizenship they do not have (except for members of Synchronized Skating Teams under the 25% quota according to paragraph 2.d) above), and Skaters who have competed in any ISU Championships, ISU Event and/or International Competition before and intend to compete in the future for another ISU Member may do so only after obtaining, through the Member for which they intend to compete, a clearance certificate (CC) from the ISU Secretariat.

All relevant procedures are published in an ISU Communication.

4. In the course of the same season (July 1st — June 30th) a Skater may skate for only one ISU Member in all ISU Championships, ISU Events and International Competitions. This also applies to Skaters who compete in several ISU sport disciplines.

A-0283-15T1

. . . .

5. <u>If special circumstances so warrant the Council may waive the citizenship/residency or the permit requirement and/or the waiting periods according to paragraphs 2.a) and c) above</u>.

. . . .

6. The Council may reject an application from an ISU Member for a Clearance Certificate for any Skater, although the formalities and requirements stated in this Rule have been met, if in the opinion of the Council granting such application would be contrary to the spirit of sports (e.g. in case an ISU Member tries to "import" several athletes with foreign citizenship, in particular when such athletes should form a new national team or its substantial part of such ISU Member).

[Int'l Skating Union, <u>Communication No. 2017 Decisions of the ISU Council</u>, Rule 109, at 9 (2016) (emphasis added), http://static. isu.org/media/342540/2017-decisions-of-isu-council-dubrovnik.pdf.]

A few days after these significant rule changes, the USFSA petitioned the ISU on plaintiff's behalf on June 17, 2016, requesting that it release her from the control of the Federation and thereby provide her with "the opportunity to qualify to compete in the future for U.S. Figure Skating and the United States in international competitions." Notably, this is the first time the USFSA has requested <u>the ISU</u> to provide a release to plaintiff, although the USFSA had twice made direct requests to the Federation that were both rebuffed.

34

A-0283-15T1

As of the writing of this opinion, the ISU has not yet acted on the USFSA's request.  Meanwhile, the rosters of Member teams for the upcoming 2016-17 international figure skating season must be set by July 1.

## II.

## A.

Aside from Kenesaw Mountain Landis, who at one point served at the same time as a federal judge and as Commissioner of Organized Baseball[8], judges generally should and do refrain from interfering with the internal matters of sports associations unless exceptional circumstances justify that interference.

As the United States Court of Appeals for the Second Circuit recently observed in overturning a trial court's nullification of an arbitral ruling by the National Football

---

[8] Judge Landis served as a district court judge in the Northern District of Illinois from 1905 to 1922, and as the first Commissioner of Organized Baseball from 1921 to 1944. Shayna M. Sigman, The Jurisprudence of Judge Kenesaw Mountain Landis, 15 Marq. Sports L. Rev. 277, 277 (2005). He was selected as Commissioner by baseball team owners in the wake of a scandal, in which eight Chicago White Sox players conspired with gamblers to throw the 1919 World Series to the underdog Cincinnati Reds. Id. at 283.  Having presided earlier over an antitrust lawsuit brought against the National and American Leagues, Judge Landis was sought out by the owners for the position with the hope that his stern approach would restore integrity to the game. Ibid. He served both as Commissioner and as a federal judge for over a year before resigning from the bench in 1922.  Id. at 284.  He continued to preside over baseball until his death in 1944.

League Commissioner addressing cheating allegations against New England Patriots quarterback Tom Brady, courts "do not sit as referees of football any more than [they] sit as the 'umpires' of baseball or the 'super-scorer[s]' for stock car racing. Otherwise, [they] would become mired down in the areas of a [sporting] group's activity concerning which only the group can speak competently." NFL Mgmt. Council v. NFL Players Ass'n, Nos. 15-2801 (L), 15-2805 (CON), 2016 U.S. App. LEXIS 7404, at *17 n.5 (2d Cir. Apr. 25, 2016) (citing Crouch v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 845 F.2d 397, 403 (2d Cir. 1988) and Charles O. Finley & Co., Inc. v. Kuhn, 569 F.2d 527, 536-38 (7th Cir. 1978)); see also Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509, 121 S. Ct. 1724, 1728, 149 L. Ed. 2d 740, 746 (2001). Applying that principle, the Second Circuit held that the NFL Commissioner, in his role as arbitrator under the collective bargaining agreement, "properly exercised his broad discretion to resolve an intramural controversy between the League and a player." NFL Mgmt. Council, supra, 2016 U.S. App. LEXIS 7404, at *4-5.

Other cases recognize this precept disfavoring judicial entanglement with the internal operations of sports. "Courts generally defer to a private [sports] organization's interpretation of its rules in the absence of bad faith or

illegality." <u>Ruiz v. Sauerland Event Gmbh</u>, 801 <u>F. Supp.</u> 2d 118, 125 (S.D.N.Y. 2010). Judges "are reluctant to interfere with the internal decisions of [sports] organizations . . . [being] ill-equipped to resolve conflicts involving the interpretation of the organization's own rules." <u>M'Baye v. World Boxing Ass'n</u>, 429 <u>F. Supp.</u> 2d 660, 667 (S.D.N.Y. 2006).

For example, in <u>Koszela v. National Association of Stock Car Auto Racing, Inc.</u>, 646 <u>F.</u>2d 749, 754-59 (2d Cir. 1981), the Second Circuit affirmed summary judgment in favor of the defendant stock car racing association, after plaintiffs, a driver and car owner, claimed the association had not adhered to its own rules and regulations and thereby had deprived them of victories in two races.

Likewise in <u>Schulz v. United States Boxing Association</u>, 105 <u>F.</u>3d 127, 132 (3d Cir. 1997), the Third Circuit observed that "courts have been understandably reluctant to interfere with the internal affairs of [private] associations and their reluctance has ordinarily promoted the health of society." (alteration in original) (quoting <u>Falcone v. Middlesex Cty. Med. Soc'y</u>, 34 <u>N.J.</u> 582, 590 (1961)). Nevertheless, the Circuit upheld in <u>Schulz</u> the New Jersey district court's preliminary injunction requiring a boxing federation to disqualify a professional boxer from a current match because of his steroid use in a prior fight.

Exercising its limited authority to intervene in a sporting decision, the Circuit reasoned that the "public's confidence that the outcome of a prizefight is fair rests squarely on the assumption that the result was not improperly influenced" by illicit factors. Id. at 135.

This policy disfavoring interference in sports adminsitration comports with more general case law in our State involving disputes over the internal affairs of private organizations. In New Jersey, "[d]eference has always been afforded to the internal decision making process of the private association." Danese v. Ginesi, 280 N.J. Super. 17, 23 (App. Div. 1995) (quoting Loigman v. Tromabadore, 228 N.J. Super. 437, 449 (App. Div. 1988)). This is because our courts ordinarily "recognize an association's right to adopt, administer, and interpret its own rules without judicial intervention." Ibid. Consequently, "[i]t is well established that a voluntary association may, without direction or interference by the courts, draw up for its government and adopt rules, regulations and by-laws which will be controlling as to all questions of . . . doctrine or internal policy." Loigman, supra, 228 N.J. Super. at 450 (second alteration in original) (quoting 6 Am. Jur. 2d, Associations and Clubs, § 5 at 433).

Even so, "[p]rivate associations do not have unfettered discretion with respect to their membership decisions." Cipriani Builders, Inc. v. Madden, 389 N.J. Super. 154, 164 (App. Div. 2006). In evaluating whether judicial intervention into a private association's membership decision is proper, courts are to consider whether a "'plaintiff [has] an interest sufficient to warrant judicial action,' and if such an interest is shown, whether 'that interest [has] been subjected to an unjustifiable interference by the defendant[.]'" Id. at 165 (alterations in original) (quoting Rutledge v. Gulian, 93 N.J. 113, 118 (1983)).

We have applied these principles by requiring the exhaustion of non-judicial remedies that might be available within a sport itself before passing upon the merits of a dispute involving an athlete. In Dolan v. United States Equestrian Team, Inc., 257 N.J. Super. 314 (App. Div. 1992), we held that an amateur horse rider's challenge of the decision of two non-profit amateur athletic associations not to select her for membership on the American equestrian team was barred because the plaintiff had not exhausted the administrative remedies available to her.

Namely, we found it pivotal in Dolan that "[p]articipation in international sports competitions on behalf of this country

is governed by the federal Amateur Sports Act[;]" the purpose of the Act was to "provide for the swift resolution of conflicts and disputes involving amateur athletes, national governing bodies, and amateur sports organizations, and protect the opportunity of any amateur athlete, coach, trainer, manager, administrator, or official to participate in amateur athletic competition . . .[;]" and the Act contained arbitration procedures to be followed in the event of a dispute. Id. at 317-19 (citing 36 U.S.C.A. § 391(b)(3) and (11)). Consequently, we ruled that the plaintiff athlete in Dolan had to exhaust her non-judicial remedies before proceeding in the courts, perceiving "nothing unfair" about requiring her to do so. Id. at 319-20.

Our decision in Dolan comported with the general doctrine favoring the exhaustion of remedies that may be available, from an administrative agency or otherwise, before a court acts to resolve a dispute and impose a remedy. Under that well-established exhaustion doctrine, parties must "pursue available internal proceedings to conclusion before seeking judicial intervention." Hernandez v. Overlook Hosp., 149 N.J. 68, 73 (1997) (citing Garrow v. Elizabeth Gen. Hosp. & Dispensary, 79 N.J. 549, 559 (1979)). This obligation stems in part from the courts' usual desire to "discourage piecemeal litigation."

40

*Garrow*, *supra*, 79 *N.J.* at 559. Additionally, "the expertise of an administrative [body] may not be exercised or known until it renders its final decision, and usually upon judicial review due deference is accorded [to] that expertise." *Ibid.*

To be sure, the doctrine of exhaustion must yield to certain exceptions. *Id.* at 561. These include circumstances "when only a question of law need be resolved," "when the administrative remedies would be futile," "when irreparable harm would result," "when jurisdiction of the [body] is doubtful," and "when an overriding public interest calls for a prompt judicial decision[.]" *Ibid.*

B.

The trial court strayed from these and certain other principles by granting partial summary judgment to plaintiff on count one and taking the extraordinary step of mandating the Federation to issue a release before potential avenues of relief to her through ISU processes were fully pursued.

At the outset, we agree with the trial court's threshold decision to treat this lawsuit as a potentially justiciable matter and carefully consider the time-sensitive issues posed affecting this young Olympian's skating career. This case is not a routine matter involving a simple membership decision within a private association. Instead, it concerns plaintiff's

41

future livelihood and her ability to compete and earn prizes as an international athlete. Because the career span of such a skater is relatively short, time can be of the essence.

As we noted in Cipriani Builders, supra, 389 N.J. Super. at 165, when a "professional society or trade association exercises 'virtually monopolistic control' over a form of economic activity, a court will be especially vigilant in protecting the interests of members and prospective members." "When a membership decision of such an association is challenged, '[t]he intimate personal relationships which pervade[] the social, religious and fraternal organizations [are] hardly in evidence and [an] individual's opportunity of earning a livelihood and serving society in his chosen trade or profession appear[s] as the controlling policy consideration.'" Ibid. (alteration in original) (quoting Falcone, supra, 34 N.J. at 596).

Nevertheless, the trial court acted too quickly here in deciding count one in plaintiff's favor on summary judgment and requiring the Federation to release her. There are several reasons why the court's decision, while undoubtedly well-intentioned given plaintiff's difficult situation, was improvident.

First, the trial court should have afforded greater deference to the autonomy of a sporting association such as the

ISU to attempt to resolve conflicts between athletes and their respective teams internally, in accordance with the rules of that association. We were guided by such principles of presumptive deference in Dolan, and they must likewise be heeded here, at least until all reasonable non-judicial processes for resolution are exhausted. We must be careful not to supplant the authority of the ISU to administer figure skating rules and regulations throughout the world.

The ISU, which is not even a party to this litigation, has obvious expertise in this realm and courts should tread lightly before interfering. In fact, it is instructive the ISU recently amended its rules to make clear that member federations cannot "unreasonably" deny releases to their former skaters. Whether or not this litigation was a catalyst in producing that change, the revision of Rule 109 illustrates that the ISU has the authority and expertise to solve athlete-federation conflicts within its own arena.

Although on appeal we required plaintiff to attempt to exhaust non-judicial remedies — which to her credit she willingly agreed to and did pursue after we raised the subject — that process should have run its course originally before dispositive relief was issued last September against the

Federation.  We disagree with the trial court's assessment that such recourse was necessarily futile.

We acknowledge that the ISU's rules, Schmid's deposition testimony, and the emails from ISU representatives all reflect that an individual skater does not have a clear avenue to obtain a release directly from the ISU.  However, the rules and the record also show that the ISU is able, and apparently has been willing, to consider releasing plaintiff if that request came through another Member federation.  Until last week, the USFSA had not taken that important step, perhaps because of the confusion caused by plaintiff's unfortunate overly-broad phrasing of her initial request.  We do not find that the ISU's process requiring a Member federation's support to override a release denial by a skater's former federation is necessarily futile or unjust.

As of this moment, the process under revised Rule 109 is actively underway.  We will not presume that the ISU will dawdle over the USFSA's request, particularly with rosters to be fixed imminently for the upcoming skating season. Although the trial court had no reason to predict that the ISU rules would change or that the USFSA would finally intercede for plaintiff, that has now occurred.

We therefore shall let the process under Rule 109 be completed, and for that reason vacate the trial court's findings that non-judicial remedies have been adequately exhausted. In doing so, we need not decide at this interlocutory juncture if the arbitration provisions in the form signed by plaintiff's mother are binding or comport with New Jersey law.[9] Instead, we defer to the sporting organization's authority for policy reasons, consistent with both tradition and sound case law. Once the ISU's decision is made, the litigation can resume in the trial court to address the consequences of that decision and the other claims raised in plaintiff's complaint.[10]

The trial court's decision on count one was also flawed insofar as it decided genuine factually-laden disputes on summary judgment on the basis of competing written submissions. We need not repeat at length the well-settled principle that courts reviewing summary judgment motions must "consider whether the competent evidential materials presented, when viewed in the

---

[9] To the extent our grant of leave to appeal could be viewed to encompass review of the trial court's discrete ruling on the arbitration clause, we vacate that aspect as improvidently granted.

[10] We need not decide here hypothetically whether a decision by the ISU concluding that it was or was not "unreasonable" for the Federation to deny plaintiff a release would have preclusive effects in this litigation. That question has not been briefed and is reserved for the trial court.

A-0283-15T1

light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995); see also R. 4:46-2(c). Courts ought not resolve contested factual issues on competing certifications and discovery materials, but instead are limited to determining from the record whether the alleged factual disputes are genuine. Agurto v. Guhr, 381 N.J. Super. 519, 525 (App. Div. 2005). If there are materially disputed facts, the motion for summary judgment should be denied. Brill, supra, 142 N.J. at 540. On appeal, we accord no special deference to a trial judge's assessment of the documentary record, and instead review the summary judgment ruling de novo as a question of law. W.J.A. v. D.A., 210 N.J. 229, 237-38 (2012); Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995) (noting that no "special deference" applies to a trial court's legal determinations).

This record contains an abundance of fact-laden issues relating to whether defendants treated plaintiff unfairly and tortiously acted without justification to thwart her career after she sought to compete for another nation. Although the trial court determined that defendants' motives were unjustified and "inscrutable," they have presented a competing explanation.

Defendants have repeatedly asserted that if the Federation unconditionally releases plaintiff, doing so will have the deleterious effect of encouraging other skaters in whom it has invested time and effort in training to leave and affiliate with other countries. The ISU has recognized that this can be a legitimate concern, although it has suggested the Federation may have already reaped a sufficient "return" on its investment in plaintiff by her pair's unprecedented success for Israel in the 2014 Olympics.

A trier of fact has not yet sorted out these competing contentions. The factfinder must evaluate, after hearing trial testimony and assessing the credibility of the witnesses, whether the Federation's asserted justification for withholding a release has been sincere and sufficiently compelling under the law of tortious interference and, by analogy, the law of restrictive covenants. See Cmty. Hosp. Grp. v. More, 183 N.J. 36, 57 (2005) (requiring consideration of an employer's legitimate business interests in evaluating the reasonableness of a challenged restraint on post-employment activities); Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 751-56 (1989) (requiring consideration in a tortious interference case of whether the defendant's conduct was justified by legitimate reasons).

These determinations are factually intertwined with the issues posed by the counts of the complaint dealing with whether defendants have defamed or disparaged plaintiff, and have wrongfully inflicted upon her severe emotional distress. The paper record on summary judgment was not appropriate to adjudicate these questions dispositively.

Indeed, the trial court correctly denied summary judgment to either side on the tortious interference claims in count two. We affirm that sound ruling. But having done so, we cannot uphold the court's dispositive, pre-emptive finding on count one that defendants acted unjustifiably. Instead, the questions of justification and motive must be decided in a plenary manner at trial.

Apart from this, the expansive remedy imposed by the trial court on count one was premature and an unwarranted incursion into the primary authority of the ISU. Although plaintiff styled her prayer for relief in count one as a request for a declaratory judgment, in substance it amounted to a demand for a mandatory injunction. "Unlike a prohibitory injunction, a mandatory injunction commands the defendant to do some positive act or particular thing, prohibits him from refusing (or persisting in a refusal) to do or permit some act to which [a] plaintiff has a legal right, or restrains [a] defendant from

A-0283-15T1

permitting his previously wrongful act to continue." Samaritan Ctr., Inc. v. Borough of Englishtown, 294 N.J. Super. 437, 444 n.4 (Law. Div. 1996) (citing Bailey v. Schnitzius, 45 N.J. Eq. 178 (E. & A. 1888)).

A mandatory injunction is "an extraordinary remedy that is only granted sparingly by the courts." Trinity Indus. v. Chicago Bridge & Iron, Co., 735 F.3d 131, 139 (3d Cir. 2013) (citing Communist Party of Ind. v. Whitcomb, 409 U.S. 1235, 1235, 93 S. Ct. 16, 16, 34 L. Ed. 2d 40, 40 (1972)). Consequently, a "party who seeks mandatory preliminary injunctive relief must satisfy a 'particularly heavy' burden[,]" Rinaldo v. RLR Inv., LLC, 387 N.J. Super. 387, 396 (App. Div. 2006) (quoting Punnett v. Carter, 621 F.2d 578, 582 (3d Cir. 1980)), such that "the moving party's 'right to relief must be indisputably clear.'" Trinity, supra, 735 F.3d at 139 (quoting Communist Party, supra, 409 U.S. at 1235, 93 S. Ct. at 16, 34 L. Ed. 2d at 40).

The mandatory injunction issued on count one, forcing the Federation to release plaintiff over its strenuous objection, did not meet these stringent requirements while the possibility of non-judicial remedies before the ISU existed. Certainly, plaintiff's predicament in not having the freedom to skate for another team while her former team has no interest in her return

is sympathetic. But, for the reasons we have already stressed, the trial court should not have preempted the ISU process. Indeed, the court's chosen remedy has been ineffective in providing any true practical relief to plaintiff within the skating world. That speaks volumes.

For these many reasons, we reverse the trial court's grant of summary judgment on count one. We also vacate the court-ordered release, effective immediately. Doing so will now clear the path for the ISU to make its awaited decision in response to the USFSA's request. If the ISU declines to grant plaintiff a release, the trial court can reconsider the posture of the case in light of that development and any issues the parties wish to assert or renew. However, the Law Division shall not reinstate any court-ordered release unless or until the parties' proofs and justifications are litigated at the requested jury trial and appropriate findings are made. We presume the trial will be conducted expeditiously after the remaining discovery is completed.

As a final note, we recognize that we allowed the court-ordered release to remain in place while this appeal has been pending. But the recent rule changes adopted at the ISU Congress and the USFSA's long-sought intercession with the ISU, as well as the applicable law, make it clear that the time has

A-0283-15T1

come for plaintiff's fate to be decided in the first instance by the sporting tribunal that has presumptive authority over her skating credentials.

The balance of defendants' arguments, including their claim that the trial judge should recuse himself because of his past adverse rulings, lack sufficient merit to warrant comment. R. 2:11-3(e)(1)(E).

Affirmed in part as to count two, reversed as to count one, and remanded to the Law Division for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION